## O'Connell *v.* Roefaro (et al., Appellant).

Argued November 20, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

54

*William A. Challener, Jr.,* for appellant.

*George S. Goldstein,* with him *John B. Flaherty, John R. Dierst, Jr.,* and *Robert E. Wayman,* for appellees.

*J. Lawrence McBride,* with him *Dickie, McCamey, Chilcote & Robinson,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 6, 1958:

John Zahorchak, 39 years of age, and David John O'Connell, 29, ironworkers, were engaged in loading steel for a crane when they were both hit by a high voltage current of electricity which hurled them from 10 to 18 feet with disastrous results: O'Connell was killed outrightly, Zahorchak was severely burned in various parts of his body.

The tragedy came about as follows. Thomas A. Roefaro owned and operated a grocery store and meat market at the corner of Broad Street and Millvale Avenue in the City of Pittsburgh. In common with practically every grocery store owner in the country he dreamed of building a supermarket and set about to accomplish this desideratum. He had plans and speci-

fications prepared for a one-story steel and brick structure to be added to his current frame building, and he hired a Herbert Flaherty to superintend the construction. For the erection of the steel framework, he contracted with the R. J. Dickey Company which brought five men to the job, among whom were Zahorchak and O'Connell.

In order to lift the steel beams and joists, which had arrived by truck, into position the services of a crane were required. R. J. Dickey ordered from the John W. Brown Equipment Rental Corporation, which is in the crane-renting business, a crane adapted to the physical properties at the Roefaro location. High tension wires passed over the newly erected 12 foot-high wall which was to become one side of the proposed supermarket, and it was necessary that the crane be of that size and type which would keep its boom free of the highly charged electric cables. Whether the crane which finally arrived was the type ordered is not clear, but it apparently was adequate for the required operation since it had lifted from the ground and swung into space practically the entire quantity of steel beams and joists when the accident occurred. At any rate, since the steel ready to be lifted was on the opposite side of the wall from the crane, which was stationed on Broad Street, and since the operator could not see over or through the wall, it was necessary for someone to signal to him when the loads were ready for lifting. The job foreman of the Dickey Company designated a Michael Volpe to do this. Volpe stood on the roof of the old building and thus could see both the load to be lifted and the crane. When the workmen attached their loads to the lead lines hanging from the boom extending over the top of the wall, he would signal the operator who would then operate the necessary lever to lift the load to the top of the new wall where other

workmen would swing the beams and joists into place for eventual riveting and formation of the new steel roof.

Throughout the entire process until the last load was prepared for lifting the crane operator kept the crane's boom at a level about six feet below the wires. When, however, the final bundle of steel had been hooked on to the lead lines and Volpe indicated by hand signal that all was in readiness, the operator pulled a lever which sent the boom soaring against the tension wires which discharged their deadly content into the lead lines, visiting upon O'Connell the catastrophe and upon Zahorchak the injuries already described.

The administratrix of the estate of O'Connell brought death and survival actions against Thos. A. Roefaro and the Brown Equipment Rental Corporation. Zahorchak filed suit for personal injuries against the same parties. The Brown Company brought in the Dickey Company as an additional defendant. The actions were consolidated for trial and the jury returned verdicts in favor of Zahorchak and the O'Connell estate against both the Dickey Company and the Brown Company.

The Brown Company seeks judgment n.o.v., urging that the crane operator was under the direction and control of the Dickey Company and that, therefore, whatever negligent act he performed which caused the accident would be entirely chargeable to the Dickey Company. It would be impossible to reach such a conclusion as a matter of law, although this is what Brown Company insists upon. The crane operator, William Schafer, was in the exclusive employ of the Brown Company which paid him his wages and undertook responsibility for his social security tax and unemployment insurance. When the Dickey Company rented

the crane, the operator Schafer, as well as an oiler, came with the equipment and was as much a part of it as the engine and boom. None of the Dickey Company employees operated, had the ability to operate, or were permitted to operate, the crane.

The appellant, Brown Company, contends that because Schafer responded to the signals imparted by Volpe (Dickey's employee) this made Schafer the servant, agent, and employee of Dickey. It should not require too much explanation to demonstrate the illogicality of such a contention. It is only natural that Schafer would have to be directed as to what he was to do when he arrived at the job site. Someone would need to tell him that this is the material which is to be moved and this is the place to which it is to be moved. A signalman would need to inform him when to lift and when to drop the load. Even the most gifted scientist entering a particular laboratory for the first time would have to ask for the location of the paraphernalia and materials with which he was to work, and he would do this without coming under the caretaker's control.

Volpe of the Dickey Company had no control over Schafer. He had no authority to instruct Schafer on how he was to operate the crane. He had no right to tell him when to begin and when to cease work. Volpe was no more responsible for the action of the crane operator than Toscanini was responsible for the actions of the organ grinder who advertised himself as "Toscanini's Pupil," because, passing by one day, the great maestro recommended to the organ grinder that he turn the crank of his organ a little more slowly. All that Volpe did, as he stood on the roof top, was to tell the elevator operator when to turn the crank, that is to say, when to operate the lever which would lift or lower the load of steel.

The facts in the case of *Pennsylvania Smelting & Refining Co. v. Duffin,* 363 Pa. 564, decided in 1950, are sufficiently similar to those in the case at bar as to be indisputable authority for our guidance here. In that case the plaintiff company hired from the defendant company a crane for the purpose of loading certain metal into a freight car. When the operator arrived with his crane, a representative of the plaintiff pointed out to him the location of the load to be lifted and deposited in a gondola car. In manipulating the boom of the crane the operator knocked over a smoke stack and the plaintiff sued the defendant company for damages it sustained. The defendant company argued, as the defendant Brown Company does here, that since a representative of the plaintiff company told the crane operator what he was to do, the crane operator thus became an agent and employee of the plaintiff. This Court, speaking through Justice (later Chief Justice) STERN, rejected the defendant's position and said: "It should be quite obvious that the facts admit of no interpretation other than that the operator of the crane remained at all times in the exclusive employ of defendant and that plaintiff not only had no right to control him in the manner in which he performed his work but in fact never asserted any such right nor sought to direct him other than merely to point out to him the job to be done. Where one is engaged in the business of renting out trucks, automobiles, cranes, or any other machine, and furnishes a driver or operator as part of the hiring, there is a factual presumption that the operator remains in the employ of his original master, since he is engaged in the very occupation for which he was originally so employed." (p. 567)

The defendant company insisted further on non-liability because it had given no instructions to the crane operator as he set off with the crane. Chief Justice

STERN commented on this: "It is wholly immaterial that defendant gave no instructions to his operator since the controlling question is merely as to his *right* to give instructions; it is obvious that no instructions are called for every time a crane is rented as to the manner in which it is to be operated. Nor did the fact that plaintiff's representative pointed out to the operator the work to be done and the place where it was to be performed militate in the slightest against the continuance of the relationship of employe and employer between the operator and the defendant." (p. 568)

In his comprehensive discussion of the principle of law involved Chief Justice STERN pointed out that "It would be absurd to suppose that a passenger hiring a truck, a car, or a machine of any kind, with its operator, would become the employer of the operator merely because of telling him what he wanted done,—for example, that a person engaging a taxicab would become the employer of the driver if he told him where he wished to be driven."

To have upheld the defendant's position in the *Pennsylvania Smelting Company* case and to uphold the identical position of the defendant company in the instant case would carry that position to such a preposterous extreme that if the patron of a symphony orchestra told the leader to play a certain number he would become responsible for the actions of the entire orchestra.

Three years after the *Smelting Company* decision, this Court in the case of *Mature v. Angelo* (1953), 373 Pa. 593, again speaking through Chief Justice STERN, laid down categorical rules which take the decision of the present case out of all possible realm of incertitude. Rule 2 reads: "The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned

is whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it."* (p. 595)

There is nothing in the record which would remotely suggest that Dickey had the right to direct Schafer as to the manner of performing his work.

The fact that Volpe signalled to Schafer when he was to lift the steel bundles cannot in any way affect the employer-employee relationship between the Brown Company and Schafer. Rule 6 in the *Mature* case proclaims this proposition of law definitively: "The mere fact that the person to whom a machine and its operator are supplied points out to the operator from time to time the work to be done and the place where it is to be performed does not in any way militate against the continuance of the relation of employe and employer between the operator and his original master." (p. 597)

The most that Brown Company could insist upon would be that the inferences arising from the evidence would make responsibility for the accident a question of fact for the jury, and in that respect Rule 7 in the *Mature* case is also controlling: "Where the facts are not in dispute and the evidence leaves no sufficient ground for inconsistent inferences therefrom, the question as to who is the servant's employer is a matter for the determination of the court, but, where the evidence presents an issue of fact, or different inferences can reasonably be drawn therefrom, the question is one for determination by the jury." (p. 598)

The action of the lower Court in refusing judgment n.o.v. is affirmed.

The Brown Company also asks for a new trial, averring certain reasons which will be taken up seriatim. It is averred, to begin with, that the Trial Court erred

in affirming the plaintiffs' fifth point for charge, the phraseology of which was taken from the opinion in the *Pennsylvania Smelting Company* case, *supra*, on the subject of factual presumption that a loaned employee remains under the control of the employer. Plaintiffs' counsel in copying the language erroneously omitted the word "factual". However, this was harmless error since the Court had charged already on that very subject matter as follows: "A servant is the employee of the person who has the right of controlling the manner of his performance of the work, irrespective of whether he actually exercises that control or not. Where one is engaged in the business of renting out trucks, cranes or machinery and furnishes the driver or operator as a part of the hiring, there is a *factual* presumption that the operator remains in the employ of the original master, and unless that presumption is overcome by evidence that the borrowing employer in fact assumes control of the employee's manner of work, the servant remains in the service of his original employer." (Emphasis supplied).

It is to be noted that the burden of proof never changed throughout the entire trial. The plaintiff was always required to prove that the crane operator was employed by the defendant. Whether this proof was met was a question for the jury which, as we have seen, refused to exculpate the Brown Company.

The appellant submits that it was error for the Trial Court to allow the introduction of evidence on safe and dangerous practises with reference to construction work at or near electric transmission lines. A trial judge must employ considerable caution in allowing testimony which has no immediate and direct application to the event which is the subject of the controversy because there hovers constantly the danger

that such testimony may in itself raise a collateral issue. Nevertheless, where the event involves the operation of forces not within the general knowledge and cognizance of lay persons the judge may in his discretion permit testimony which will assist the jury in determining the obligations and responsibilities of due care.

No agency is so mysterious, elusive, and deadly as electricity. Did the defendant Brown Company here exercise the care required in the circumstances? The original action, it will be recalled, was against Roefaro, the property owner, and the Brown Company. The plaintiffs maintained that the original defendant was negligent in failing to request the power company to furnish safety measures for the protection of all the employees on the job while working in the vicinity of high tension wires. In the case of *Zinkiewicz v. Cit. Elec. & Ill. Co.,* 53 Pa. Superior Ct. 572, 580, the plaintiff was injured by coming into contact with a live electric wire which had broken because of the alleged negligence of the defendant and was left hanging over the road on which the plaintiff walked. The plaintiff contended that if the defendant company's plant had been equipped with proper safety devices the accident would have been averted. In affirming the verdict returned in favor of the plaintiff in that case, the Superior Court said: "It was, therefore, entirely proper for the court below to admit the testimony of those duly qualified as experts in the business, tending to establish that if the plant of the defendant company was equipped with the necessary devices, commonly known and in general use, those in charge of the plant would have immediate notice of the breaking and fall if the wire which carried this deadly current, and that they could at once have turned off the current, thus avoiding all danger to the public."

We are satisfied that the Trial Court in the case at bar did not commit error by allowing the testimony complained of by the defendant.

In their complaints against Roefaro the plaintiffs alleged that Roefaro was his own general contractor. Roefaro did not deny this averment. During the trial the Court allowed Roefaro to file an amended answer in which he denied he was the general contractor. The appellant maintains that it was reversible error for the Court to allow the amended answer and to permit evidence to show that Roefaro was not the general contractor on the job. This was a matter for the discretion of the Court. In *McKay et al. v. Beatty,* 348 Pa. 286, 287, we said: "Procedural rules are not ends in themselves but means whereby justice, as expressed in legal principles, is administered. They are not to be exalted to the status of substantive objectives. It is for this reason that Pa. R. C. P. No. 126 (332 lxvii) provides: 'The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.' "

Finally, the appellant Brown Company claims that the Trial Court erred in charging the jury as to the measure of damages and that the verdicts were excessive. The record substantiates the lower Court's opinion in which it said on these subjects:

"In this case two statutes were involved, the Death Act and the Survival Act, which meant that the jury had to return two verdicts in the O'Connell case, and under no circumstances could there be a duplication of damages. This was very clearly pointed out to the

jury along with some of the factors which they could, if they so desired, utilize in arriving at their decision. . .

"Defendant further contends that there was not sufficient competent evidence that the deceased would have continued to contribute to his parents' support during their lives. The record clearly refutes this contention. The deceased was a healthy young man who was very ambitious. Even while in high school he held part time jobs, and after graduation he was steadily employed, usually holding two jobs at one time. He furthered his education by attending a trade school and for some six months attended college, but unfortunately had to withdraw in order to support his parents, his father having become ill. This young man gave up his college training in order to support his parents. This was certainly a great sacrifice; indeed the record is replete with details showing unusual devotion to the parents which tend to support the jury's apparent belief that he would have provided for his parents under almost any circumstances. *His own desires were secondary, as shown by his turning his earnings over to his parents, remodeling their home and purchasing furniture for it.* Medical and dental bills for the parents were paid by him. O'Connell seldom if ever dated girls, let alone keep steady company with one. The record is devoid of any evidence that at the time of the tragic accident he had any intention of marrying or that, even in that event, he would have left his parents without providing for their support. . .

"We find no merit in the contention that the verdicts were excessive. Plaintiff Zahorchak, though he is still able to work and is employed, is not able to perform the same type of work since the accident. As a result he had had to accept a job which pays approximately 40% less than he was previously receiving. It is

not difficult to see that, based on an eight hour day and a five day week, as per rates set forth in the record, Zahorchak has suffered a loss of wages alone in excess of the $5,000 awarded him by the jury. His loss of wages is approximately $2,500 per year, and up to the date of this opinion he has lost approximately $10,000. We certainly cannot hold that a verdict of $5,000 is excessive. . .

"Another factor to be considered is our rising price index. As shown by the labor rates in the record, the wages for the type of work plaintiffs were engaged in have increased 12.7% from the date of the accident in 1953 until the time of trial in November, 1956. Wages for this type of work are now 128% higher than they were prior to World War II, and the present economic condition does not justify a belief that they will decrease in the future. If many of the money verdicts awarded in years gone by were geared to today's money index, which compensates for the general rise in prices, it would be very apparent that this verdict is not as large as it appears. It is not unreasonable for this court to uphold a verdict which may seem large, when in reality it is not large at all."

Affirmed.