**Margaret V. PARLOW, Plaintiff-Respondent,**

v.

**DAN HAMM DRAYAGE CO.,
Defendant-Appellant.**

No. 50639.

Supreme Court of Missouri,
Division No. 1.

May 10, 1965.

Motion for Rehearing or to Transfer to Court
En Banc Denied June 14, 1965.

Morris E. Stokes, Paul E. Dixon, F. Douglas O'Leary, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for respondent.

Heneghan, Roberts & Cole and John J. Cole, St. Louis, for defendant-appellant.

WELBORN, Commissioner.

This is an action by Margaret Parlow for the wrongful death of her husband. John Parlow was employed as a welder by the Ace Metal Products Company which was constructing a tank for Monsanto Chemical Company. Ace engaged a crane and operator for the project from the Dan Hamm Drayage Co. (referred to herein as "Hamm"). Parlow's death occurred when a portion of the crane collapsed, allowing a metal roof piece being hoisted into place by the crane to fall, carrying Parlow to his death. His widow brought this action against Hamm, relying upon the res ipsa loquiture doctrine. Hamm denied that at the time of the accident the crane was under its control and alleged it was under the control of an employee of Ace. A jury returned a verdict of $25,000 for plaintiff. After its motion for new trial had been overruled, Hamm appealed to this court.

Ace Metals Products Company of Amarillo, Texas, contracted with Monsanto Chemical Company to construct a cylindrical steel tank for the latter in St. Louis. The tank was to be 60 feet in diameter, with a shell (or sides) 30 feet in height and a peaked roof 35 feet high at the peak. The shell was constructed of 6' x 20' pieces of steel, varying from $\frac{7}{16}''$ to $\frac{1}{4}''$ in thickness. The roof was to be formed from 12 pie-shaped pieces of $\frac{3}{16}''$ plate steel some 10 to 14 feet wide at the base and 8 inches wide at the point. The base of each piece was to be welded to the shell of the tank and the point to a metal pipe to be erected in the center of the tank.

Johnny Sugg, the Ace superintendent on the job, came to St. Louis and hired boilermakers to weld the pieces of the tank in place. Parlow was one of those so employed. Sugg also employed an operating engineer to operate Ace's winch truck which was used to hoist the pieces of the sides of the tank in place for welding. The winch truck was so used, situated on the floor of the tank, and the sides were built around it.

Near the time that construction of the sides of the tank was completed, Sugg called Dan Hamm Drayage Co., which was in the business of providing machinery for hire. Sugg talked to Andy Sargent, a sales engineer employed by Hamm, about obtaining a crane for the Monsanto job. Sargent came to the job site and Sugg explained to him that a crane was needed to lift the winch truck out of the tank, to set a 20" pipe some 35 feet in length in place in the center of the tank and to lift the roof pieces in place and hold them while they were welded. The weight of the truck was approximately 10,-000 pounds, the pipe 2,800 pounds and each of the 12 roof pieces 2,700 to 3,000 pounds.

According to Sugg, he left to Sargent the determination of the type of machinery required for the job. Hamm's Koehring Model 304 mobile crane, referred to as a 25-ton capacity crane, was selected for the job. The crane had been acquired by Hamm in June, 1950. According to Sugg, Hamm was to furnish a crane, the operator, the fuel and the repairs or whatever it might take to do the work. Ace was to pay Hamm $177 per day for the use of the crane and the operator.

The crane was driven from Hamm's yard to the job site by an oiler, Harold Workman, an Ace employee. Hamm employed, through the union hall, Earl Skelton to operate the crane. Skelton had worked for Hamm previously, his latest prior employment having been in 1959. Hamm paid Skelton for his work and handled all matters incidental to his employment, such as deducting and paying his social security taxes, income tax withholding, etc. Skelton accompanied the crane to the job site, as did a Hamm truck which transported the boom, the jib, an "A" frame and other equipment for rigging the crane.

The crane arrived at the job site on November 7, 1960. Skelton directed Ace boilermakers working on the job in the assembly of the boom and the rigging of the crane. The crane had a 45-ft. boom made of four 10-ft. sections and one 5-ft. section, which were bolted together. The rigging also included a 30-ft. jib or extension of the boom, which was attached to the end of the boom. The jib was held in place by an "A" frame installed at the tip of the boom. The "A" frame was held perpendicular to the boom by cables running from it to the base of the boom and from the "A" frame to the tip of the jib. The "A" frame, which Hamm had obtained in June, 1951, was 5 feet long and 3'3" wide at its base. It was made of $\frac{5}{16}$" angle steel.

The winch truck was removed by the crane from the tank. Using the crane with the jib in place, the 20" pipe was set in

place in the center of the tank and secured by guy wires attached to the shell.

The crane was then used to unload the roof pieces from a railroad gondola car on a siding at the job site. To unload the roof pieces a single eye, used only for such purpose, had been welded to the surface and a cable was attached to the eye and then to the crane hook. After the roof pieces had been unloaded, an eye was welded in the vicinity of each of the three points of the pie-shaped section.

On November 11, 1960, work was started on installation of the roof sections in place. Skelton was operating the crane which was located near the base of the tank. A scaffold had been erected around the circumference of the tank, approximately four feet from the top of the shell. Parlow and another Ace welder, Gillespie, were on the scaffold as the first piece of the roof was hoisted to the top of the tank by the crane. A U-shaped clevis was hooked into each of the three eye plates and the clevis was fastened to a cable and the three cables or choker fastened to a ring which was hooked into the crane hook. The lifting was accomplished by raising the crane hook, attached to a cable which ran through a sheave, or pulley at the end of the jib, a sheave on the "A" frame, and then to the drum in the crane cab. Parlow gave signals to Gillespie of the movements necessary to fit the section in place and Gillespie, who was standing on the scaffold directly above the crane operator, relayed the signals by hand movements to Skelton. The roof section was swung into place, using the 3-cable choker attached to the three eyes near the points of the section. The section was then tack welded to the shell by Gillespie and Parlow. 2-inch tack welds were made approximately every 8 inches. This welding operation took approximately 30 minutes.

After the tack welding to the shell had been completed, the next part of the job was to affix the apex of the section to the pipe in the center of the tank. After the base of the section had been tack welded to the

shell, the apex of the section was approximately two feet below the height required for the proper roof pitch. Parlow, who was on the section, gave signals to Gillespie, who in turn relayed them to Skelton, that the point of the section should be raised to obtain the proper pitch. With no change in the rigging that had been employed to raise the section in place, Skelton placed in operation the cable drum which raised the crane hook and the section was raised to the desired level. However, when the drum was braked, the section settled some four to six inches and Parlow signalled Gillespie, who again signalled Skelton, to "pick it back up again." Skelton did so, but the section again settled and the operation was again repeated. On the third time the desired height was held. After waiting about a minute, Parlow walked out to the point of the section, preparatory to doing the welding necessary to attach the section to the center pipe. Parlow had left his welding equipment near the point where he had been tack welding the roof section to the shell. Gillespie started to bring the equipment out to Parlow. He had taken one or two steps when "everything caved in." The roof section fell into the tank with Parlow on it. The tack welds held the edge to the shell and Parlow slipped from the point of the section and fell to the floor of the tank, suffering injuries which resulted in his death.

The fall of the roof section was the result of the collapse of the "A" frame. The frame bent approximately double back toward the crane cab. The collapse of the "A" frame left the jib inadequately supported and the weight of the load and of the jib pulled the jib to a vertical position.

According to Skelton, at the time the "A" frame collapsed, the crane motor was running, but it was "dogged off" and the load was being held in place by the braked drum. Skelton testified that the motor had been "dogged off" from 10 to 30 minutes before the "A" frame collapsed. He had noticed no sign of unusual strain on the crane and had no sort of forewarning of any possible

difficulty. Workman, the oiler who was in the crane at the time, testified that the collapse occurred within a few seconds after the last "hoist up" signal had been received.

On this appeal, defendant's first contention is that the evidence showed, as a matter of law, that Skelton was the borrowed servant of Ace, working under their exclusive direction and control and engaged in their work when the casualty occurred. "Therefore, the court erred in overruling defendant's motion for directed verdict and for judgment after verdict and judgment in accordance with said motions."

We reject the defendant's contention that the evidence showed that, as a matter of law, Skelton was the employee of Ace at the time of the casualty. Skelton was employed by Hamm. He was paid by Hamm. He could be discharged only by Hamm. Sugg testified that he was not a crane operator and that he did not attempt to tell Skelton how to work with the crane. He simply told Skelton what he wanted to accomplish and Skelton would do the work. He did not tell Skelton how the crane should be rigged. That was entirely up to Skelton. Sugg testified that, had he considered the operation of the crane improper or dangerous, he would have stopped it, but his complaint ultimately could be remedied only by Hamm.

Defendant points to the work order prepared by Hamm, a copy of which was delivered to Skelton when he went to work on the job, containing the direction "work as directed at Monsanto." There is no question that the time and place of Skelton's work on the job with the crane had to be determined by Ace employees. Defendant also points out that Skelton at the time of the casualty was working in response to signals received from Ace employees in the operation of the crane. This co-operation was essential for the success of the joint efforts of Skelton and the other employees. At the time of the casualty, Skelton in the crane on the ground could not see the work going on on the roof. Persons in the immediate vicinity of such work had to let

Skelton know what movement was required to bring the plate into proper position. However, the signals merely told Skelton where the plate should be moved and Skelton alone decided how to accomplish the result sought. He alone, for example, decided that the lifting of the sheets should be by raising the crane hook rather than by raising the boom.

According to Restatement of Agency, 2d, Sec. 227, p. 500, whether or not a person "rented" becomes a servant of the one whose immediate purposes he serves depends in general upon the same factors which determine that one acting for another is a servant rather than an independent contractor. See Restatement of Agency, 2d, Sec. 220, p. 485. As in the latter determination, "it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation. * * * If the inference is clear that there is, or is not, a master and servant relation, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered." Ibid., Comment c, pp. 486–487.

"In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." Ibid., Comment b, p. 501.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value." Ibid., Comment c, p. 501.

We are of the opinion that the factors which might establish that Skelton became a servant of Ace are not so clear and definite that they call for a determination of the question as a matter of law. There was a sufficient contrary indication

to require that the issue be determined by the jury.

We do not take McFarland v. Dixie Machinery & Equipment Company, 348 Mo. 341, 153 S.W.2d 67, 136 A.L.R. 516, relied upon by defendant, to require a contrary result. Numerous factors in that case which were specifically mentioned by the court do not exist here. In McFarland, we find the following (153 S.W.2d 1. c. 72):

"If the act involved herein had been connected with the upkeep of the tractor (injury due to mechanical defects), or even its operation for a limited use, we might have a different question. * * * However, here there was nothing wrong with the tractor. On the contrary, the act causing injury was solely one of alleged negligent driving over the very ground that the borrowing employer (through its foremen) directed it be driven over to perform the task it directed the borrowed (or rented) employee to do. * * * Furthermore, the severance from defendant's employment was so complete, and the actual renting employer (the City) had such full control, of both the rented machine and employee, that it could and did loan both to the borrowing employer, the WPA; and likewise so that such employer could move both from one WPA project to another. In addition, this was no temporary loan for a limited purpose or time, but this tractor was used (as was intended) by the borrowing employer for almost a year, during which time it was left on its project at night and the driver, Whalen, went there every day to work with it as the borrowing employer might direct."

Here the rented crane first supplied and the one furnished to replace it after the accident were used for a total of nine days. In McFarland the bulldozer and operator were rented to do generally the work in which the lessee was engaged. Here the crane was obtained to perform three specific jobs and none other. The facts here are sufficiently different to render inapplicable the McFarland conclusion.

The reasoning which we have here followed, that the matter of Skelton's employment was properly submitted to the jury, was applied in the following crane cases: Chartier v. Winslow Crane Service Company, 142 Colo. 294, 350 P.2d 1044; White v. Bye, 342 Mich. 654, 70 N.W.2d 780; O'Connell v. Roefaro, 391 Pa. 52, 137 A.2d 325; Ambrosius Industries, Inc. v. Adams, Ky., 293 S.W.2d 230.

We will not endeavor to consider at length and to discuss each of the numerous cases of other jurisdictions cited by defendant. Many may be found in an Annotation in 17 A.L.R.2d 1388, 1442. Different factual situations obviously produce different conclusions. In some situations courts are more likely to declare the relationship as a matter of law. See Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614, and Kessler v. Bates & Rogers Const. Co., 155 Neb. 40, 50 N.W.2d 553. In our opinion, the situation here presented is not such that the inference was clear as to Skelton's status and the question was properly one for the jury.

Defendant questions plaintiff's verdict-directing instruction in its submission of the element of defendant's control of the crane at the time of its collapse. Plaintiff's Instruction No. 4 submitted her claim under the res ipsa doctrine. By the instruction the jury was required to find that the "crane was at the time of the collapse of the 'A' frame in the exclusive control and management of defendant and its crane operator * * *." Defendant contends that there was insufficient evidence upon which to submit this issue, contending that the evidence showed that the crane was either under the exclusive control of Ace or was jointly controlled by Ace and the defendant at the time of the accident.

The contention that the crane was under the exclusive control of Ace must necessarily depend upon defendant's contention that Skelton, the operator of the crane, was, at the time of its collapse, Ace's employee. We have previously rejected this conclusion as a matter of law. The question remains whether or not there was such evidence of control by Ace employees as to require the conclusion as a matter of law that there was joint control by Ace and the defendant which would preclude application of the res ipsa doctrine.

■ In this connection the "exclusive control" which is spoken of as an essential element of the res ipsa doctrine does not have the same connotation as the element of control which bears upon the master-servant relationship. The essential meaning of this requirement for res ipsa is that "the evidence must afford a rational basis for concluding that the cause of the accident was probably 'such that the defendant would be responsible for any negligence connected with it.' That does not mean that the possibility of other causes must be altogether eliminated, but only that their likelihood must be so reduced that the greater probability lies at defendant's door." 2 Harper and James on Torts, Sec. 19.7, p. 1086. See Prosser, Res Ipsa Loquitur in California, 37 Cal.Law Review 183, 201. Such was, in effect, the meaning given the term in Littlefield v. Laughlin, Mo.Sup., 327 S.W.2d 863, where the owner of an elevator was held liable under res ipsa although plaintiff was operating the elevator at the time it fell; in Parlow v. Carson-Union-May-Stern Company, Mo.Sup., 310 S.W.2d 877, where the owner of a scaffold which collapsed was held liable under res ipsa, although plaintiff exclusively was using the scaffold at the time of its collapse and none of defendant's employees were present; in Leisure v. J. A. Bruening Company, Mo. Sup., 315 S.W.2d 705, where a plate glass window fell from a building and the owner was held liable even though neither he nor his employees were present or in the vicinity. See also Kelly v. Laclede Real Estate & Investment Co., 348 Mo. 407, 155 S.W.2d 90, 138 A.L.R. 1065.

■ In this case, the defendant attempted to refute any inference that the negligence which resulted in the collapse of the crane was attributable solely to the

defendant by showing that the cause of the collapse was the attempt of the operator, acting in response to signals given by Ace employees, to raise the roof section after the edge had been tack welded to the shell. Defendant's theory is that such attempt resulted in an effort to lift a load in excess of the capacity of the crane and caused its collapse. The jury was, of course, entitled to disregard this contention, 'leaving unexplained the collapse of the crane, operated, as it could have found, by defendant's employee. Plaintiff was not required to exclude all possible inferences of causes due to other than the defendant's negligence. Plaintiff was required only to establish facts which raise a reasonable inference of defendant's negligence. Maxie v. Gulf, M. O. R. Co., 358 Mo. 1100, 219 S.W.2d 322, 325(5), 10 A.L.R.2d 1273; Layton v. Palmer, Mo.Sup., 309 S.W.2d 561, 565, 66 A.L.R.2d 1242. A jury having rejected the defendant's contention could have inferred that the cause of the collapse was negligence on the part of the defendant, there being no other compelling inference thereof.

In Cantley v. Missouri-Kansas-Texas R. Co., 353 Mo. 605, 183 S.W.2d 123, relied upon by defendant, plaintiff was an employee of the railroad suing under the Federal Employers' Liability Act and relying on the res ipsa doctrine. Plaintiff was a switching foreman and had the duty to give signals to the engineer in a switching operation. Plaintiff, injured in such operation, submitted an instruction under which the defendant might have been held liable if the jury found that the locomotive, tender and tracks "were owned, maintained or under the control of the defendant." This instruction was held erroneous because control was necessary for liability under res ipsa and mere ownership and maintenance of facilities involved were not sufficient, particularly in the circumstances of that case where the railroad alleged that at the time of the accident the locomotive was being operated in response to signals and directions given by the plaintiff.

The court did not hold that, as a matter of law, plaintiff could not recover because he had some right of control over the operation. Rather the court held that, although the jury might have found that the cause of the accident was the speed of the train, a matter over which plaintiff might have had superior control, nevertheless the matter was one for the jury and the existence of this element of control would not preclude recovery if the jury should have concluded that the injury was caused by negligence on the part of the railroad in an aspect not subject to the plaintiff's control. We do not consider Cantley to preclude a jury's finding of necessary control by the defendant of the crane at the time of the collapse.

In Brown v. St. Louis County Gas Co., Mo.App., 131 S.W.2d 354, the element of control was held lacking as a matter of law in a res ipsa case in which a thermostatic control of a residential gas heater had failed. Defendant's employee had merely attempted to adjust the control at the plaintiff's request. The control was in plaintiff's house and the defendant's sole connection with it was the adjustment its employee made. The evidence showed that the control functioned for several days after the adjustment and then failed. In holding that a lack of control by the defendant over the instrumentality precluded application of res ipsa, the court pointed out that the evidence showed numerous potential causes for the failure of the control, for none of which defendant would be responsible. In effect, the plaintiff failed to show that the cause of the accident was probably such that the defendant would be responsible for any negligence connected with it.

We do not consider, as defendant argues, that Cantley required a hypothesizing of the facts from which the element of control could be found by the jury. The defect in the instruction held erroneous in Cantley was that it permitted a finding of ownership and maintenance to be substituted for a right of control. We do

not find plaintiff's instruction in this case erroneous because it submitted only the ultimate question of the defendant's control of the crane at the time of the accident. If defendant considered that a further factual hypothesis was called for, defendant could have submitted it. In fact, defendant endeavored to do so by its Instruction F, the rejection of which by the trial court is assigned as error. The offered instruction read as follows:

"With respect to the term 'exclusive control and management' as used in Instruction No. 4 you are instructed that if you find and believe from the evidence that Johnny Sugg(s), by virtue of his position as job superintendent for Ace Metals Company had the right to stop the operation of the crane at any time including the time it was engaged in lifting and installing the roof section mentioned in evidence and if you should further find that as said superintendent on the job, Johnny Sugg(s), had a right to direct the crane operation with respect to the time and manner of performance of the aforesaid roof section job, and if you should further find and believe that by reason thereof the said Johnny Sugg(s) retained some right of control over said crane and its operation on the aforesaid job of lifting and installing the roof section then you should not find that the exclusive control and management of said crane was in defendant Dan Hamm Drayage Company as submitted to you in said Instruction No. 4 and your verdict in this case should be in favor of said defendant."

■ The court did not err in failing to give this instruction. The instruction merely required that the jury find from the facts hypothesized that Sugg retained some right of control over the operation of the crane in the roof installation. Assuming that the evidence authorized the instruction, its deficiency lies in the fact that it failed to relate, in any manner, the hypothesized right of control to the incident in question. The divided control which precludes application against the defendant of res ipsa must be related to the cause of the casualty. Such was, in effect, the holding of Cantley, supra.

■ Defendant contends that plaintiff's Instruction No. 4 was erroneous because it failed to hypothesize facts from which the jury might find two essential elements of res ipsa: (1) That the occurrence was one that ordinarily does not happen in the absence of negligence; (2) That the defendant had superior knowledge or means of information as to the cause of the occurrence. These matters are regularly stated as essential elements of a res ipsa case. See McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 559, 92 A.L.R. 641; Layton v. Palmer, Mo.Sup., 309 S.W.2d 561, 564(2), 66 A.L.R.2d 1242; Littlefield v. Laughlin, Mo.Sup., 327 S.W.2d 863, 865 (2).

■ Although the two matters here referred to are essential elements of res ipsa cases, they are matters which determine, as a question of law, the right of a plaintiff to submit a case under that doctrine. As has been pointed out, res ipsa loquitur is a term employed to describe a negligence case in which the negligence is proved by circumstantial evidence, and, in which, the conditions for the application of the doctrine being present, the character of the accident is sufficient to take the case to the jury. Harke v. Haase, 335 Mo. 1104, 75 S.W.2d 1001, 1003(7). As in any other circumstantial evidence case, "it is a judicial function to determine * * * whether certain circumstances, as a matter of law, warrant a certain inference." Hoock v. S. S. Kresge Co., Mo.Sup., 230 S.W.2d 758, 760. In this case plaintiff's Instruction No. 4 was patterned according to the suggestion made in Harke v. Haase, supra. The defendant has cited no case in which it has been held that the elements here referred to must be submitted to a jury for its finding. In our opinion no such submission is required and plaintiff's instruction was not erroneous for failure to sub-

mit such matters. See Leet v. Union Pacific R. Co., 25 Cal.2d 605, 155 P.2d 42, 50(11), 158 A.L.R. 1008.

In connection with the failure of the plaintiff's instruction to hypothesize the first element above mentioned, the defendant contends that the court erred in refusing its Instruction D which would have told the jury:

"The Court instructs the jury that if you find and believe from the evidence that the specific and direct cause of the collapse of the crane strut (A-frame) and jib was the overload or excessive strain put upon it by lifting or hoisting up on the roof section mentioned in evidence after it was tack welded to the tank if you so find, and if you further find that in so lifting and raising the aforesaid roof section after it was tack welded the crane operator under the circumstances, was relying upon the signals and directions given to him by the employees of Ace Metals Company and, if you further find that in so doing he was exercising ordinary care with respect to the operation of said crane, that is such degree of care which an ordinarily careful person would exercise under the same or similar circumstances, then you are instructed that your verdict should be in favor of Dan Hamm Drayage Company."

■■■ The refusal of this instruction was not error. In inferring negligence on the part of the defendant, the jury was not limited to a finding that Skelton was not exercising due care in the operation of the crane at the time of the "A" frame collapse. Inferences of other negligence on the part of the defendant were permissible from the fact of the occurrence and the jury should not have been limited by Instruction D. Jones v. Terminal R. R. Ass'n of St. Louis, Mo.Sup., 242 S.W.2d 473, 478(11–13).

■■■ In connection with the element of superior knowledge defendant contends that the "evidence conclusively showed that defendant did not have superior knowledge or means of information as to the cause of the occurrence, but that the employees of Ace Metal Products Co., including plaintiff's deceased, had superior knowledge and means of information as to the cause of the occurrence." Defendant bases this contention upon the fact that the work on the roof was going on 30 to 36 feet above the ground, out of the view of Skelton who was necessarily relying on the signals from the boilermakers. Although the evidence might well show that the boilermakers, including Parlow, had knowledge superior to that of Skelton as to what was going on on the roof, it does not show superior knowledge on their part as to the cause of the occurrence. The defendant contends that error was involved in the refusal of its Instruction G in this respect. This instruction read:

"The Court instructs the jury that if you find and believe from the direct evidence that the specific, definite and direct cause of the collapse of the crane strut (A frame) and jib was the overload or excessive strain put upon it by lifting or hoisting up on the roof section mentioned in evidence after it was tack welded to the tank if you so find, and if you further find that in so lifting and raising the aforesaid roof section after it was tack welded the crane operator was acting subject to, and in accordance with, directions and signals given to him by the employees of Ace Metals Company, and if you further find that under the circumstances in evidence the boilermakers, including John Parlow, had superior knowledge and opportunity to know, the effect of such hoisting operations and the cause of the collapse of the jib and roof section than did the defendant herein if you so find, then you are instructed that your verdict in this case should be in favor of defendant Dan Hamm Drayage Company."

There was insufficient evidence to support this instruction. There was no evidence that Parlow was knowledgeable as to the crane's operation and its capacity. He had seen the crane raise the point of

the roof section to its proper location three times. He, therefore, had no reason to question that the crane had the capacity to perform the job for which it was intended. Defendant points to no evidence which shows Parlow's superior knowledge as to the cause of the occurrence as distinguished from his knowledge of what was happening on the roof. The fact that he knew that the edges of the section had been tack welded to the shell would not charge him with knowledge of the cause of the occurence.

Defendant contends that evidence of both plaintiff and defendant proved that the specific cause of the casualty was the overloading or excessive strain placed on the "A" frame and jib and, therefore, res ipsa was inapplicable. That such was defendant's theory is clear. That the evidence of both parties proved such theory is not clear. There is no dispute that the edge of the roof section had been tack welded to the shell of the tank. Plaintiff's evidence did not show that the efforts thereafter to raise the point of the section to the desired level placed any overload or excessive strain on the "A" frame or jib. Even the testimony of defendant's witness, Skelton, who operated the crane, tended to prove otherwise. He stated that he noticed no rocking of the crane or laboring of the motor when the roof section was hoisted into place following the tack welding operation. According to Skelton, the crane was sitting still with the drum clutch disengaged at the time of the collapse. The power on the hoist had been "dogged off" for from 10 to 30 minutes. Certainly this evidence did not prove, as defendant contends, the specific cause of the casualty.

In the same connection, defendant contends that the trial court erred in excluding testimony which it proposed to offer through an expert witness in support of its theory as to the cause of the collapse of the "A" frame and jib. Mr. John W. Poulter, an engineer employed by the Koehring Company, manufacturer of the crane, testified on behalf of the defendant. His work with Koehring involved checking cranes and their component parts for stress capacity and load analysis and his qualification as an expert was not questioned.

After establishing that the crane as rigged at the time of the occurrence had a load capacity of 7,500 pounds, defendant's counsel propounded several hypothetical questions to the witness relating to the effect on the jib and the "A" frame if the signal was given to hoist or lift up the roof section after the base had been tack welded to the shell. Plaintiff's objections to the questions were sustained, whereupon the defendant made the following offers of proof: (1) that the witness would express his professional opinion that the cause of the collapse of the A-frame and the resultant fall of the jib and roof section was that the crane was being subjected to an improper use by the boilermakers in the hoisting operation that they were calling upon the crane and the operator to perform; (2) that the witness would state that in his professional opinion the boilermakers should have disengaged the cables attached to the rear lugs and that the effect of the signals to hoist and lift up on the roof section after the base had been tack welded was to impose upon the crane and the jib and A-frame the additional weight of the entire tank attached to the ground; (3) that the point of the roof section could have been safely lifted within the capacity of the jib and crane as rigged if the back two lugs would have been disengaged; (4) that the cause of the failure of the A-frame was "a ductile failure caused by overloading—a compressive weight on the A-frame."

"The question of the qualification of a witness as an expert in the field concerning which his testimony is sought and the necessity for admission of expert testimony in a given situation rests in the first instance in the sound discretion of the trial court, and its decision in those respects is not to be set aside in the absence of showing of an abuse of discretion." Yocum v.

Kansas City Pub. Serv. Co., Mo.Sup., 349 S.W.2d 860, 864(1); Superior Ice & Coal Co. v. Belger Cartage Service, Inc., Mo. Sup., 337 S.W.2d 897, 906(8). We find no abuse of discretion in the rulings of the trial court in this case. Even if the rulings on the offers of proof were erroneous, the defendant received the benefit of an effective demonstration by Poulter of defendant's theory as to the cause of the collapse of the "A" frame and jib. The witness testified that the lifting of the roof section, after it had been tack welded, transmitted the lifting force to the shell of the tank. He then demonstrated that, when a section such as the roof section involved was attached at its base, a lifting force thereafter exerted through three cables such as attached to the eyelets near each point of the section would place all of the loading on the lines attached to the eyelets near the attached base. Further expressions by the witness as to whether or not the method employed in the case at hand was proper would have been of little practical assistance to the jury on the basis of Poulter's testimony. On the evidence presented, the jury would have been equally capable of drawing a conclusion in this regard. Since the essential test of the admissibility of expert opinion evidence is whether or not it will be helpful to the jury (State v. Paglino, Mo. Sup., 319 S.W.2d 613, 622–623(8)), we cannot conclude that the court's refusal of the testimony offered here was error.

Again in connection with this entire matter, the defendant complains of error in the trial court's refusal of its Instruction L which read as follows:

"The Court instructs the jury that plaintiff is seeking recovery against defendant under the doctrine known in the law as res ipsa loquitur which permits an inference of negligence under certain circumstances without proof of the specific act or omission constituting negligence and the nature or character of the accident mentioned in evidence rather than the fact of the accident determines whether this doctrine apples in a particular case.

"In that connection you are instructed that where the real or precise cause of the accident is definitely shown by direct evidence there is no room for an inference that the accident was due to a different cause. Therefore, you are instructed that if you find and believe from direct evidence in this case, exclusive of inferences, that the base or butt end of the roof section was tack welded to the shell of the tank and if, you further find and believe that thereafter, at the direction and request of the boilermakers, the roof section settled down and was hoisted up on two or three occasions and if you further find that in so lifting up on said roof section in the manner described in evidence there was necessarily an undue strain and overload on said jib and strut (A-frame) in excess of its rated capacity, and if you further find and believe that such overload, if any, directly caused said strut (A-frame) to buckle and the jib and roof section to fall and if you further find and believe by reason of direct evidence in this case that this was the specific cause of the fall of the jib and roof section and resultant death of John Parlow, and that the collapse and fall of the aforesaid strut (A-frame) jib and roof section was not due to any other cause shown by the evidence, or reasonable inference deducible therefrom, then you are instructed that plaintiff is not entitled to recover under the said doctrine of res ipsa loquitur as submitted to you in Instruction No. 4 and your verdict should be in favor of defendant Dan Hamm Drayage Company."

 By this instruction the court would have submitted to the jury whether or not the res ipsa loquitur doctrine was applicable. This is not a matter properly for the jury's determination, but is a matter of law for the court. To attempt to instruct a jury on the intricacies of the res ipsa loquitur doctrine could do nothing more than add to the already existent confusion regarding the scope, application and effect of the doctrine. We find no error in the refusal of Instruction L.

The defendant would find error in Instruction No. 5 given at the plaintiff's request and reading:

"The Court instructs the jury that in determining whether or not the defendant had the exclusive management and control of the Koehring crane mentioned in evidence as submitted to you in Instruction No. 4, the Court does not mean actual physical control, but refers to the right of control of said crane at all times mentioned in evidence.

"In this connection you are further instructed that the fact that defendant's crane operator, if you find him to be such, received signals to guide him in the operation of said crane, would not preclude a 'right of control' on the part of defendant, as that term is used in these instructions."

■ The defendant does not question the first paragraph of this instruction, but contends that the second is erroneous because it improperly singled out and gave undue prominence to only a part of the evidence on the issue of control and improperly limited the jury with respect to their consideration of the effect of the signals received by the crane operator. In support of this assignment, defendant cites Spalding v. Robertson, 357 Mo. 37, 206 S.W.2d 517, 523; Zumwalt v. Chicago & A. R. Co., Mo. Sup., 266 S.W. 717, 726, and Shaffer v. Sunray Mid-Continent Oil Company, Mo. Sup., 336 S.W.2d 102, 107.

The rule relied upon, as found in the cases cited by the defendant, is well-established. However, we do not find the rule applicable here. Defendant does not complain that the instruction is erroneous as a matter of law. See Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, 484. The instruction being negative in character, there would be no way in which additional facts might be added, contrary to the situation presented in the cases

relied upon by defendant. We find no error in the instruction.

Defendant's final objection is to plaintiff's instruction defining the standard of care imposed upon John Parlow under the defendant's submission of Parlow's contributory negligence. The court at the defendant's request gave an instruction on Parlow's contributory negligence. At the plaintiff's request, the court gave the following instruction:

"On the issue of Contributory Negligence, the Court instructs the jury that the decedent, John Parlow, was required to use for his own safety only such care as an ordinarily careful and prudent person would have used under the same or similar circumstances in evidence, and if he did so he was not negligent."

■ Defendant objects to this instruction on the ground that it fails to hypothesize facts from which a jury could make a finding that Parlow was not negligent. However, this is not, as defendant asserts, a verdict-directing instruction on behalf of the plaintiff. It is merely a definition of the standard of care imposed upon Parlow under the defendant's contributory negligence submission. No hypothesizing of facts is required in such an instruction. Defendant's other objection to the use of the word "only" in the instruction is conceded to be without merit in the absence of error regarding the matter above discussed.

Finding no error, the judgment of the trial court is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.