Charlie DOLLAR, Plaintiff-Respondent,

v.

OZARK ENGINEERING COMPANY, a corporation, and Charlie Rhodes, Defendants-Appellants.

No. 9453.

Missouri Court of Appeals, Springfield District.

Oct. 15, 1973.

George C. Baldridge, Joplin, Melvin L. Roberts, York, S. C., for plaintiff-respondent.

John R. Martin, Joplin, for defendants-appellants.

BILLINGS, Judge.

Plaintiff Charlie Dollar was awarded damages in the sum of $38,000.00 for personal injuries by a Jasper County jury. Defendants' after trial motions resulted in the court ordering a remittitur of $15,000.-00 [accepted by plaintiff] and a denial of judgment for defendants pursuant to their trial motions for a directed verdict and their alternative request for a new trial. In this appeal defendants contend plaintiff failed to make a submissible case of negligence and complain of plaintiff's verdict directing instruction. We affirm.

In view of defendants' first assignment of error and a sub-division of their second point, we recite the evidence in the light most favorable to the plaintiff with all reasonable inferences to be drawn

therefrom. We disregard defendants' evidence except insofar as it aids plaintiff's case. Lifritz v. Sears, Roebuck and Company, 472 S.W.2d 28 (Mo.App.1971).

Plaintiff, an ironworker, was a member of the crew of Hamilton Erection Company [hereinafter Hamilton] which had been employed to erect a television tower at Joplin, Missouri. In order to erect such a tower it is necessary to utilize the services of a crane to lift and position the base section of the tower. Once this task is completed Hamilton's crew then proceed to add additional sections of tower. Hamilton's superintendent, Clint Capps, rented a crane from Ozark Engineering Company [hereinafter Ozark]. Ozark does not lease a crane without one of their operators and in connection with the television tower project defendant Rhodes, Ozark's employee, was the crane operator. The charge for the crane and operator was the sum of $25.00 per hour.

The crane here involved was of the mobile variety in that it was mounted on the rear portion of a specially constructed truck. the cab of the crane rests on what is commonly called a. fifth-wheel and this permits 360 degree rotation of the crane when it is in use. The controls for operating the crane are located within the cab and the boom is affixed to the front portion of the crane. The crane had a 12½ ton capacity and was equipped with a boom of some 70 to 75 feet.

The base section of the tower, 85 to 90 feet in length and weighing approximately 4½ tons, was to be lifted by the crane to a near-vertical position and placed on a concrete center pier anchor. When in place the tower was to be held in position by the use of temporary guy wires which would extend from the tower to anchors.

The mobile unit was placed so that the truck part was headed in an opposite direction from the center pier with the crane facing the pier. For purpose of helping guide the tower onto the anchor an A-frame truck, equipped with a winch and cable, was positioned beyond the center pier.

Capps, in addition to directing the members of his crew in various tasks as the tower base was being lifted by the crane, also provided assistance to the crane operator by the use of standard hand signals since the operator's view of the anchor was increasingly obscured as the section of tower neared the vertical position. Capps also used hand signals to aid the operator of the A-frame truck. Capps told defendant Rhodes to "watch his end of the operation" and he and his crew would watch other things around the job, including checking the balance of the crane to see that it did not get overbalanced as the lifting progressed.

As the tower base was lifted to an approximate 70 degree angle to the ground the superintendent noticed that the rear end of the crane platform (the front end of mobile unit) appeared to be a "little light" and not "sitting there steady." Lifting of the tower was temporarily halted while Capps and defendant Rhodes discussed the situation. Rhodes suggested that counterweights be attached to the front end of the mobile unit and that a second A-frame truck, equipped with winch and cable, be utilized and available for assistance in the event the crane became over-balanced. Capps had his crew comply with these suggestions by attaching 3000 pounds of weight to the front of the mobile unit and positioning the second A-frame truck in front of the unit with a cable extended from the truck winch, across the cab of the crane, and affixed to the crane's boom. This cable did not have tension on it but, as indicated, was available for use if required.

Vertical lifting and positioning of the tower on the anchor continued and as the crane held the tower atop the anchor (for a period of 10 to 20 minutes) the Hamilton crew chained the tower to the anchor and began rotating the tower so that it would be in proper alignment with guy wire an-

chors. To string the temporary guy wires the second A-frame truck would be required and plaintiff was directed by Capps to disconnect its cable from the boom of the crane. Plaintiff mounted the cab of the crane and climbed up on the boom. As he removed the cable, the crane and tower shifted and "lurched" from side-to-side. Capps called to defendant Rhodes to "catch the swing" but since the operator was standing up and not seated at the crane's controls he did not do so. Capps then yelled at plaintiff to get off of the crane and as plaintiff started to jump to the ground the crane again "lurched" as the tower fell, causing plaintiff to lose his balance as he jumped. Plaintiff's injuries were sustained when he struck the ground.

Capps testified that when the tower and crane first shifted defendant Rhodes was still on the crane but was standing up and not in his seat; that when he yelled to Rhodes to "catch the swing" the operator either had to sit down and "grab it" or get off and that the operator chose the latter alternative. The superintendent said Rhodes was the first person to leave the crane once it started swinging and that since it did not shift any further than it did initially if Rhodes had caught the swing the tower would not have fallen. Capps also stated that if the swing of the crane had been locked it could not have shifted to begin with. When the tower fell it jerked the cable, that ran from the drum of the crane through the boom to the load, completely off of the drum and the crane spun around counter-clockwise on its base six or seven times.

An employee of the television station was observing the lifting of the tower base and he said that when the tower first started to tip the plaintiff was on the top of the crane and that at the time he did not see the operator in the crane.

Inspection of the crane following the fall of the tower did not reveal any mechanical defects or malfunctions. The crane was equipped with a "load" brake which holds a load once it has been lifted. To activate this brake the operator is required to press down on the brake with his foot and then turn "your heel down". The boom or "swing" lock on the crane is operated by means of a hand brake. In addition, the crane is equipped with a "dog-lock" which is located at the base beneath the crane and when the crane is turned in a certain position a pin drops into a notch. In a crane of this type the operator has to sit down in order to operate the various hand and foot controls. Because of the lowness of the cab roof the operator, in getting out of the crane, has to slide out sideways much as one does in getting out of an automobile.

In support of their claim of lack of submissibility of negligence the defendants contend there is no evidence that defendant Rhodes abandoned the crane before the tower fell. This contention misses the mark in that plaintiff's theory for recovery was that the crane operator abandoned *his place* on the crane and thereby permitted the tower to fall.

■ To constitute actionable negligence there must be a duty or obligation which defendant is under to protect the plaintiff from injury, a failure to discharge that duty, and injury resulting from such failure. The duty must be owing to the person injured and the act or omission such that under the circumstances of which defendant had actual or imputed knowledge, would be likely to produce the injury. Wolfmeyer v. Otis Elevator Company, 262 S.W.2d 18 (Mo.1953); Whealen v. St. Louis Soft Ball Ass'n., Inc., 356 Mo. 622, 202 S.W.2d 891 (1947); Davidson v. St. Louis-San Francisco Ry. Co., 229 S.W. 786 (Mo.1920); 57 Am.Jur.2d, Negligence, § 33 (1971).

■ From the facts which we have related the jury was entitled to find that a duty rested upon crane operator Rhodes to operate Ozark's crane in such a manner as to avoid injury to plaintiff as the tower was lifted and held in place. This duty included the operator remaining in his seat,

his place on the crane, whereby he could control the crane and its load by means of the various foot and hand controls—including the braking devices. Rhodes was a crane operator with some nine years experience. He knew or should have known that by getting out of the seat, standing upright, and leaving the crane's controls unattended, he could not control the crane or its load. He knew plaintiff and the latter's co-workers were in immediate proximity of the crane and tower, and knew or should have known there was a likelihood of injury to plaintiff if he left the crane's controls and permitted the tower to fall. By removing himself from his operator's position on the crane, defendant Rhodes could not keep the crane and tower under control and could not take the necessary preventive action to "catch the swing" and prevent the tower's fall. The jury could find that if defendant Rhodes had performed his duty of controlling the crane's operation the mishap would not have occurred. Szofran v. Century Electric Co., 255 S.W.2d 443 (Mo.App.1953); Anno.: Crane or Derrick—Negligent Operation, 81 A.L.R.2d 473 (1962). Also see American Marietta Co. v. Griffin, 203 A.2d 710 (D.C. App.1964). We conclude the trial court properly overruled defendant's motion for a directed verdict and submitted the factual question of negligence to the jury.

It is also contended there was no evidence to support the giving of plaintiff's verdict director wherein the jury was required to find that Rhodes was an employee of Ozark and operating the crane within the scope and course of his employment. In support of this position the defendants argue that Rhodes was the special employee of Hamilton and thus Ozark should not be vicariously liable for any negligence of Rhodes. We disagree.

Ozark was in the crane rental business and with each crane rented furnished the crane operator. Defendants seek to avoid Rhodes employment as Ozark's operator at the time of the accident by relying upon what was done by Superintendent Capps and his crew at the job scene, including hand signals to Rhodes.

In Parlow v. Dan Hamm Drayage Co., 391 S.W.2d 315 (Mo.1965), Ace Metal Products Company was constructing a tank for Monsanto Chemical Company and Ace had engaged a crane and operator (Skelton) from defendant Hamm. Hamm contended the crane operator was the employee of Ace at the time of the accident there involved by reason of the activities of Ace's superintendent, Sugg. In rejecting Hamm's contention the court stated (1. c. 319–320): "Skelton was employed by Hamm. He was paid by Hamm. He could be discharged only by Hamm. Sugg testified that he was not a crane operator and that he did not attempt to tell Skelton how to work with the crane. He simply told Skelton what he wanted to accomplish and Skelton would do the work. He did not tell Skelton how the crane should be rigged. That was entirely up to Skelton. . . .

. . . There is no question that the time and place of Skelton's work on the job with the crane had to be determined by Ace employees. Defendant also points out that Skelton at the time of the casualty was working in response to signals received from Ace employees in the operation of the crane. This cooperation was essential for the success of the joint efforts of Skelton and the other employees. . . . However, the signals merely told Skelton where the plate should be moved and Skelton alone decided how to accomplish the result sought."

■ We have reviewed the evidence relevant to defendant's contention and in light of Parlow and authorities therein cited are of the opinion that the jury could reasonably find that Hamilton's superintendent was not in control of the work done by Rhodes, but merely acted as a ground co-ordinator; one who could stand back and get an overall view of the operation, something Rhodes could not do from the crane cab. Capps' testimony indicates

**732**

his job was to co-ordinate the activity of the first A-frame truck and other ground personnel with that of the crane operator, and not to direct Rhodes in his actual operation of the crane or manipulation of the controls. We hold there was evidence to support plaintiff's instruction.

The judgment is affirmed.

TITUS, C. J., and STONE, J., concur.

HOGAN, J., not participating.