John Dale BRATTON, a minor,
Plaintiff-Respondent,

v.

SHARP ENTERPRISES, INC., d/b/a
Seers Crane Rentals and Seers Company,
Defendant-Third-Party Plaintiff-Appellant,

and

James Lenhart, Densel V. Gordon,
Defendants.

BUCYRUS–ERIE, INC., a corporation,
Defendant-Respondent,

v.

John HAGGARD, Jr., d/b/a Haggard
Heavy Hauling, Third-Party
Defendant-Respondent.

No. KCD 27703.

Missouri Court of Appeals,
Kansas City District.

May 31, 1977.

Robert M. Kroenert, James H. McTurnan, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, for appellant, Sharp Enterprises, Inc.

Karl Shawver, Jr., Paola, Kan., Allan R. Browne, Ennis, Browne, Martin & Tapp, Kansas City, for plaintiff-respondent.

Hollis H. Hanover, Wm. Dirk Vandever, Popham, Popham, Conway, Sweeny & Fremont, P. C., Kansas City, for third-party defendant-respondent.

Before SWOFFORD, P. J., PRITCHARD, C. J., and DIXON, J.

DIXON, Judge.

This is an appeal by defendant of a jury verdict and judgment for $50,000 in favor of plaintiff for the wrongful death of his decedent and defendant likewise appeals

the dismissal of its claim for indemnity against the employer of the decedent.

The relationship of the parties is so complex, and so likewise the procedural steps in the trial court, that an overall initial statement is required to bring the proceedings to their present apex in some logical fashion.

The wrongful death of plaintiff's father resulted from a crane accident which occurred during the construction of the Harry S. Truman Sports Complex in Jackson County, Missouri. Specifically, the death occurred when a crane collapsed during an attempt to install a steel sound booth.

The general contractor for construction of the Sports Complex was the joint venture of Sharp-Kidde-Webb (S–K–W), comprised of Sharp Brothers Contracting Company, Del E. Webb Corporation, and Walter Kidde Constructors. Don Sharp was president of Sharp Brothers Contracting Company. S–K–W subcontracted all of the structural, miscellaneous and ornamental iron work to Midstates Ornamental Iron Company, which in turn subcontracted the manufacture of the main bents and catwalks to support the lighting and sound system for the stadiums to St. Joseph Structural Steel Company. St. Joseph then subcontracted its hauling and erection work to John Haggard, d/b/a Haggard Heavy Hauling, the employer of plaintiff's decedent and the third-party defendant.

S–K–W leased cranes for the project on a monthly basis from Sharp Enterprises, Inc., d/b/a Seers Crane Rentals, a defendant herein. John Sharp, the president of Sharp Enterprises, is the son of Don Sharp. Sharp Enterprises obtained its cranes from defendant Bucyrus-Erie, Inc. under a lease-purchase agreement. Bucyrus-Erie manufactured these cranes.

Haggard, having previously lost his ironworker foreman, borrowed a foreman, Duane Mitchell, and two ironworkers from S–K–W for this job. These three men were on S–K–W's payroll. To facilitate the timeliness of this particular job, S–K–W also furnished Haggard with a 110-ton Bucyrus-Erie crane which S–K–W had previously rented from Sharp Enterprises. In accordance with the custom of the crane rental business, an operator and an oiler had been furnished to S–K–W by Sharp Enterprises with the crane. These men were in turn furnished to Haggard by S–K–W. Haggard was to pay S–K–W for the crane plus the wages of the operator, James Lenhart, and the oiler, Densel Gordon. Lenhart and Gordon were on the payroll of Sharp Enterprises.

Plaintiff was awarded death benefits against Haggard, as plaintiff's decedent's employer, by the Department of Labor and Industrial Relations of Missouri, Division of Workmen's Compensation.

Plaintiff brought this action for wrongful death against Sharp Enterprises, Inc., James Lenhart, Densel Gordon and Bucyrus-Erie, Inc. Prior to trial, plaintiff voluntarily dismissed as to Lenhart and Gordon. Count I of plaintiff's amended petition states a cause of action against Sharp Enterprises, Inc. Count II, originally against Bucyrus-Erie, Inc. only, but amended to add Sharp Enterprises, pleads strict liability for defective construction of the crane. Count II of plaintiff's petition was dismissed at the close of plaintiff's direct evidence and defendant Sharp Enterprises' evidence.

Sharp Enterprises impleaded John Haggard as a third-party defendant. Sharp Enterprises also filed a cross claim against defendant Bucyrus-Erie for indemnity (erroneously denominated as a third-party petition), and Bucyrus-Erie cross claimed against Sharp Enterprises for indemnity. As a consequence of the dismissal of Count II of plaintiff's petition, the trial court also dismissed the cross claim of Sharp Enterprises against Bucyrus-Erie. Bucyrus-Erie then voluntarily dismissed its cross claim against Sharp Enterprises. At the close of Sharp Enterprises' evidence, the court also sustained the motion of third-party defendant Haggard for a directed verdict or in the alternative to dismiss the third-party petition. The cause then was submitted to the jury against Sharp Enterprises only, and the plaintiff recovered a verdict. Sharp Enterprises is the only appellant, and it appeals the judgment for plaintiff and the

trial court's action as to the Sharp Enterprises' claim for indemnity against Haggard.

Thus, although complex in its early stages, this dispute is now between only three parties, plaintiff, Sharp Enterprises, and Haggard. The principal issues raised on this appeal are (1) the propriety of submitting the case on the theory of res ipsa loquitur, (2) whether the issue of control over the actions of the borrowed servants was properly submitted, and (3) whether the relative negligence of third-party plaintiff Sharp Enterprises and third-party defendant Haggard justified dismissal of the former's third party petition.

The crane accident which resulted in the death of plaintiff's decedent occurred on Monday, July 17, 1972. On Friday, July 14, Haggard began the work on erecting two steel bents and a sound cage for sound equipment at Arrowhead Stadium. The steel bents consist of steel columns which extend vertically along the outer stadium wall and then reach out and over the inside of the stadium at an angle. The sound cage is the steel frame for the loudspeaker system for the stadium. It rests on the steel bents which extend out and into the stadium. The work was to be completed by 8:00 a. m. on Monday so that the sound equipment contractor could commence its work.

The vertical columns were erected on Friday, July 14, and on Saturday, July 15, the two columns reaching out over the stadium were set. The sound cage was also assembled on Saturday. At 6:00 a. m. on Monday, July 17, work was commenced on setting of the sound cage on the steel bents. The sound cage was attached to the crane outside the stadium wall where two men got on it. The load was then raised and swung over the stadium wall and set down just inside the stadium, at the top level of seats. At this time, three other men, including plaintiff's decedent, loaded some equipment on the sound cage and got on themselves. Duane Mitchell, the foreman, was sitting astraddle the top of the stadium wall supervising this work and giving hand signals to the crane operator. Mitchell was a direct employee of S–K–W, but was "borrowed" by Haggard for this specific job. Lenhart was operating the crane, and Gordon was the crane oiler. Both these men were direct employees of Sharp Enterprises, the crane rental company, and were, like Mitchell, "borrowed" by Haggard.

After the men and equipment were added, Mitchell signaled to Lenhart to raise the load and boom out. The boom raised the sound cage up about 70 feet to the top of the bents. Mitchell signaled for Lenhart to stop so that he could ascertain from one of the men on the sound cage how much farther the load needed to go. Lenhart testified that he eased the load to a stop. Suddenly the sound cage with the men on it fell approximately 100 feet, landing among the seats near the football field. A witness who was also riding on the sound cage testified, "[W]e started to swing over, I think, and started to boom down, and all at once, why, everything went—just started agoing . . . ." The boom fell with the cage and hit the stadium wall and buckled. Plaintiff's decedent died as a result of injuries sustained in the fall. What has been stated thus far is substantially without conflict in the evidence.

There is no real dispute that the accident occurred because the crane tipped over as a consequence of attempting to "boom" out or extend the radius of the lift beyond the capacity of the crane considering the actual weight of the load. The real dispute centers on the cause of the failure to properly determine the weight of the load. Looking now to the plaintiff's evidence alone, the following testimony was adduced.

Plaintiff's first witness, Delbert Lewis, was an employee of S–K–W who had himself been riding on the sound cage when it fell. He testified that the men were on the sound cage in order to connect it to the steel bents. No other access to the steel bents was available. On cross examination by Sharp Enterprises, the witness testified as to the equipment and men placed on the sound cage, adding weight estimated to be in excess of 1,200 pounds. On cross examination by third-party defendant Haggard,

the witness testified that prior to the lift his visual estimation of the weight of the sound cage was six tons.

Plaintiff next called Duane Mitchell, the foreman borrowed by Haggard from S–K–W. He testified that on Saturday, when the first steel bent was being lifted, Haggard noticed some vibration in the crane's outrigger pads and the witness and Haggard decided to add some extra weight to the crane for stability. A fork-lift truck was tied to the front of the crane and no vibration occurred during the lift of the second bent. This witness also testified as to the accident itself, stating that just before the sound cage fell he saw the front of the crane rig lift a bit. The load fell slowly and then went fast. In a tipping situation, an operator can first try to get under his load and if he cannot, then he can drop it to avoid tipping. When the load fell, the boom of the crane hit the top of the stadium wall and buckled. The steel bents weighed considerably more than the sound cage, approximately 17,000 pounds each.

On cross examination, Mitchell further testified as to the weights of the equipment and men added to the load and the weight of the sound cage. Prior to the lift, Haggard told Mitchell that the sound cage weighed 5,500 pounds; and, based upon a visual examination, Mitchell assumed Haggard had made a mistake and meant 5.5 tons. Mitchell further testified that the crane operator was present when the men were discussing the probable actual weight of 5.5 tons. It is not the job of the foreman to refer to the crane charts which plot safe angles, radii and weights of loads. Mitchell had the operator conduct a "dry run" without a load for the sound cage lift to get an angle therefor and then apply the angle to the chart to see how much weight could be lifted. The load was never actually weighed. Mitchell also testified on cross examination that the crane oiler is to watch the crane to see if it gets light and that the crane oiler was not as close to the crane as he should have been during this lift.

The deposition of the crane operator, James E. Lenhart, was then read in part.

He testified that there were no bumper counterweights on the crane at the time of the accident, although one was available at the equipment yard of Sharp Enterprises. There were no counterweights at all on the front bumper, the forklift truck having been removed before the sound cage lift. The operator was following the hand signals of the foreman, Duane Mitchell, during the lift. Once the cage was lifted over the stadium wall, the operator could only see the top of the cage. He didn't learn how many men were on the cage until after the accident, although Mitchell said he was present when the matter was discussed. The crane tipped at the front before the fall, but the boom did not buckle until it hit the top of the stadium wall. An operator refers to a crane chart to determine safety of lifts. By knowing angle of lift and length of the boom, the operator can determine safe weight. The operator consulted the chart for the weight given of 5,000 pounds for this lift and did not look to see if a 5-ton lift would be safe. If a load is light, the engine will run easily, and if heavy, the engine pulls. A heavier load requires the operator to run the engine faster. On this lift, the load lifted easily due to a two part line. When the load is being boomed out, the engine does not run faster because it is idling. More stress is put on the rig the farther the load is boomed out so that it is more likely to tip than if the load is just being lifted straight without booming out. Just before the load fell, the operator had stopped booming out. The moment the operator stopped booming out, the load fell. The crane oiler did not call out before the rig tipped. When a crane tips, operator should stop and find a place to set the load. All other loads which had tipped on the crane operator tipped slow. The two causes of tipping are overloading or soft ground and the latter was not a cause here because the rigger pads were sitting on a railroad track. In this case, the operator didn't have time to take corrective action. The radius at the time of the accident was about 100 feet. The most weight he could pick up at a 100 foot radius was 11,800 pounds, including the crane cable, block and hook, with a

25% safety factor. Some cranes have rear as well as side outriggers, but these are mainly to pick up long booms with and not for lifting loads. On this crane, there were four outriggers extending from the sides, but it was not designed with rear or front outriggers and was rigged in the manner appropriate for its design.

Defendant Sharp Enterprises' initial argument on appeal is that the trial court erred in giving a res ipsa loquitur instruction because "plaintiff pleaded and offered proof of specific negligence as to the same occurrence." There is no doubt that plaintiff pleaded both general and specific negligence in alternative averments. It is defendant's contention that a plaintiff who pleads specific negligence or who proves specific negligence by direct evidence is precluded from submitting his claim under the doctrine of res ipsa loquitur. *Venditti v. St. Louis Public Service Co.*, 360 Mo. 42, 226 S.W.2d 599 (1950); *Williams v. St. Louis Public Service Co.*, 363 Mo. 625, 253 S.W.2d 97 (Banc 1952). "In the one instance plaintiff admits by his pleading and in the other he demonstrates by the evidence he adduces that he has access to and knows the specific negligence causing his injuries, and that the necessity giving rise to the public policy creating an exception to the general rule for proving specific negligence does not exist in the case." 226 S.W.2d at 602. The rule is summarized in *Powell v. St. Joseph Railway, Light, Heat & Power Co.*, 336 Mo. 1016, 81 S.W.2d 957, 960 (1935);

"Thus, the res ipsa loquitur rule aids the injured party who does not know and therefore cannot plead or adduce proof showing the specific cause of or how the event which resulted in his injury occurred, but if he knows how it came to happen, and just what caused it, and *either* specifically pleads *or* proves the cause, there is neither room nor necessity for the presumption or inference which the rule affords . . . However, when . . . plaintiff pleads general negligence and by the pleading invokes the aid of the res ipsa loquitur doctrine, he does not lose or waive the benefit thereof, and the right to rely thereon in

the submission of the case to the jury, by introducing evidence tending to show specifically the cause of the accident if by the evidence the cause is still left and remains in doubt or is not clearly shown . . . ." (Emphasis supplied.)

From these and other cases cited below, it was clearly the settled law in this state that a plaintiff may not submit his case under a theory of res ipsa loquitur if he either (1) pleads specific negligence only, or (2) pleads general negligence but proves the real and precise cause of injury. *Marquardt v. Kansas City Southern Railway Co.*, 358 S.W.2d 49 (Mo. banc 1962); *Hall v. St. Louis Public Service Co.*, 266 S.W.2d 597 (Mo. banc 1954); *Lukitsch v. St. Louis Public Service Co.*, 362 Mo. 1071, 246 S.W.2d 749 (Banc 1952); *Wenzel v. St. Louis Public Service Co.*, 361 Mo. 448, 235 S.W.2d 312 (1950); *Sanders v. City of Carthage*, 330 Mo. 844, 51 S.W.2d 529 (1932); *Stolovey v. Fleming*, 328 Mo. 623, 8 S.W.2d 832 (1928); *Price v. Metropolitan St. Railway Co.*, 220 Mo. 435, 119 S.W. 932 (1909); *Lobello v. Laclede Gas Co.*, 517 S.W.2d 474 (Mo.App. 1974); *Mizerany v. Gittemeier*, 437 S.W.2d 103 (Mo.App.1969).

Rule 55.10, based on Section 509.110 RSMo 1969, before its amendment in 1973, read in pertinent part as follows:

"A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. . . ."

In *Hoeller v. St. Louis Public Service Co.*, 199 S.W.2d 7, 10 (Mo.App.1947), the court held that these provisions of a predecessor to Section 509.110, "Were not, . . . ever intended to authorize a party to combine in one petition a charge of general negligence with one of specific negligence, and then have the court ignore the charge of specific negligence by submitting the case to the jury on general negligence." The rule, however, was modified in 1973 to add the phrase, "regardless of consistency" to the last sentence which provides, "a party may also state as many separate claims

or defenses as he has *regardless of consistency* and whether based on legal or equitable grounds." The issue thus becomes one of whether the 1973 amendment changed the established procedural rule concerning the pleading of res ipsa and specific negligence alternatively.

Missouri has allowed alternative pleading since 1855.[1] The present wording of Section 509.110 was adopted in the Civil Code Act of 1943,[2] which adopted many of the provisions in the Federal Rules of Civil Procedure. Unlike the Federal Rules, however, the Missouri Code did not specifically permit pleading of inconsistent claims or defenses. Judge Hyde and Judge Douglas of the Missouri Supreme Court commented on this omission as follows:

"There is confusion in this State whether inconsistent pleading is permissible. Many cases say that if the proof of one allegation would disprove the other allegations, such allegations are inconsistent and may not be joined in one pleading. (See *Craine v. Metropolitan St. Ry. Co.*, 246 Mo. 393, 152 S.W. 24). But the latest expression of the Supreme Court on this subject is in *State ex rel. v. McKay*, 325 Mo. 1075, 30 S.W.2d 83 which holds the present statute which permits 'a fact to be pleaded in the alternative, does not require that the alternative must be consistent the one with the other, but proceeds on the theory that the one or the other (but not both) may be true, and, if so, constitutes a basis for a cause of action.' The court says of the alternatives pleaded in that case that both could not be true, but one or the other could be true, and the plaintiff had a cause of action under the one found to be true. However, it would seem still to be required that such allegations be stated in either hypothetical or alternative form. This is reasonable because it gives the other party better information about what is being claimed." Lawrence M.

Hyde and James M. Douglas, Pleading Provisions of the 1943 Civil Code Act, 15 Mo. Bar Journal 71, 72 [1944].

The court in *State ex rel. Dunklin County v. McKay* was construing the provisions of Section 1254 of the Revised Statutes of 1919 which provided, "Either party may allege any fact or title alternatively, declaring his belief of one alternative or the other, and his ignorance whether it be the one or the other." 30 S.W.2d at 88. More recently, the immediate predecessor to Rule 55.10, which did not contain the phrase, "regardless of consistency," was held to allow a party to set forth alternative claims regardless of consistency. *Seiser v. Maggard*, 457 S.W.2d 678 (Mo.1970); *Boyd v. Margolin*, 421 S.W.2d 761 (Mo.1967). See also Comment, Inconsistent Pleading Under Missouri Statutes, 23 Mo.L.Rev. 63 (1958). Thus, it seems that prior to the 1973 amendment, the only rule of prohibition against inconsistent pleading in the alternative was in the res ipsa-specific negligence situation.

When the language "regardless of consistency" was added to the rule, it brought the Missouri Rule in line with the long established Federal Rule. Under that established Federal Rule, the federal courts had permitted the pleading of res ipsa and specific negligence. *Pomeroy v. Pennsylvania Railroad*, 96 U.S.App.D.C. 128, 223 F.2d 593 (1955). The addition must have been intended to make some change and the inclusion of the language of the Federal Rule suggests the adoption of a view that such pleadings be permitted.

If the older cases were based on policy as the language would suggest, there is a fallacy in the logic. To say that a pleader knows the facts and his statement of them deprives him of an alternative theory of recovery is as applicable to any alternative pleading. Further, the statement of a fact in the pleading is far from its proof by evidence. A plaintiff may have a theory as

---

1. "Either party may allege any fact or title alternatively, declaring his belief of one alternative or the other, and his ignorance whether it be the one or the other." Ch. 128, Section 46, Revised Statutes of Missouri (1855).

2. Mo. Laws 1943, at 353, § 42.

to how a casualty occurred and be unable to make the proof. If the other elements of the doctrine are satisfied, the res ipsa doctrine should still be available to the plaintiff if he cannot prove his specific negligence theory. Anomalously, what could not be done under the early pleading rules could be accomplished in two trials. In *Maxie v. Gulf M. & O. R. Co.*, 356 Mo. 633, 202 S.W.2d 904 (1947), *aff'd on second app.* (following amendment of petition) 358 Mo. 1100, 219 S.W.2d 322 (1949), *cert. denied* 338 U.S. 823, 70 S.Ct. 69, 94 L.Ed. 499 (1949), a plaintiff who failed in his proof on the first trial and submitted on res ipsa in the second was permitted the benefit of the doctrine.

Based on the foregoing, it must be held that the 1973 amendment to Rule 55.10 was intended to permit the filing of alternative pleading of res ipsa and specific negligence.

The rule remains, however, that a plaintiff who proves specific negligence forfeits the right to a submission upon the theory of res ipsa loquitur. The defendant has premised the second branch of its argument upon this rule.

*Venditti*, and *Williams, supra*, announce such a rule as the quotation from *Venditti, supra*, demonstrates. That rule, however, is subject to the qualification that it is only when the specific cause of the injury is proven that the plaintiff loses his right to a res ipsa submission. *Williams, supra*, announces the limitation on the rule as defendant concedes in its brief. Plaintiff relies upon *Timmons v. Kurn*, 231 Mo.App. 421, 100 S.W.2d 952 (Mo.App.1935) which permitted a recovery under a res ipsa submission when there was a considerable amount of evidence tending to show negligence. *Timmons* notes that, as with many fact oriented rules of law, the difficulty is one of application. 100 S.W.2d at 956.

The defendant argues in its brief in attempting to distinguish *Timmons* that the "cause" of the disaster clearly appears. It asserts that there is no dispute that the crane was overloaded. That contention, the basic premise of the defendant's position, mistakes physical cause and legal cause. The physical reason for the casualty is

clear, but the conduct which would give rise to an inference of negligence on the part of someone in causing or permitting the crane to be overloaded is far from clear and in sharp dispute under the evidence.

A helpful analysis of the distinction between proof of physical causation of the casualty and the concept of legal causation is found in 1 S. Speiser, The Negligence Case/Res Ipsa Loquitur, § 5.21 (1972). The author there says that proof by the plaintiff of the instrumentality causing the injury and the management and control of the instrumentality by the defendant does not preclude a res ipsa loquitur submission. This textual statement is supported by Missouri authority. *Belding v. St. Louis Public Service Co.*, 358 Mo. 491, 215 S.W.2d 506 (Banc 1948); *Semler v. Kansas City Public Service Co.*, 355 Mo. 388, 196 S.W.2d 197 (Mo.1946); and *Sharon v. Kansas City Public Service Co.*, 208 S.W.2d 471 (Mo.App. 1948).

■ Applying this analysis then to the facts of the instant case, the proof that the physical cause of the crane tipping because of overload does not prove the specific negligence which caused the overloading. That question was sharply disputed under the evidence and, as the facts in plaintiff's case which are recited here disclose, may have been from a variety of causes. The plaintiff's proof in this case is not so clear and specific on the negligence causing the injury as to bar him from the res ipsa loquitur submission.

■ Defendant also contends that the instruction given by the court on the theory of res ipsa is erroneous on a variety of other grounds. The first of these complaints is that plaintiff's verdict director on res ipsa refers to defendant Sharp Enterprises rather than the agents of Sharp in the paragraph requiring the finding of negligence. Defendant asserts without other citation of authority that MAI 18.01 requires that the names of the agents or some other identification be inserted in the paragraph finding negligence. In the ordinary case, this would be true, *Wills v. Townes Cadillac-*

*Oldsmobile, Inc.*, 490 S.W.2d 257 (Mo.1973); but, as plaintiff asserts, the fundamental submission here was of res ipsa. Upon this record, the negligence of the "defendant," based on the defendant's control of the instrumentality, is what is to be inferred and specific acts of negligence need not be found by the jury. The instruction properly submits the issue of control. *Lawley v. Kansas City*, 516 S.W.2d 829 (Mo.App.1974). To tell the jury that they may infer negligence from the control of the defendant of instrumentality and in the same instruction direct them to find specific named persons to be negligent would be misleading and confusing.

Defendant's additional claim that the instruction improperly omitted certain bracketed terms required by MAI 18.01 in this case is not supported by the record.

■ Again bereft of any citation of authority, defendant attacks the plaintiff's verdict directing instruction because it improperly follows the option open to plaintiff under MAI 19.01 when a verdict is directed against one of two or more joint tort feasors. Aside from the recitation of the MAI instructions, the entire argument of defendant is contained in two sentences:

"The misleading impression which 19.01 was obviously drafted to correct, has been compounded by plaintiff's misuse of the third alternate of 19.01 in said Instruction No. 3. The result is a confusing and inconsistent instruction which was prejudicial to defendant Sharp Enterprises."

The option given to plaintiff under MAI 19.01 is intended to permit the plaintiff to submit without use of the "direct result" language of verdict directing instructions. This palpably so that a jury will not be confused or misled by assuming that despite the presence of joint tort feasors, the injury or damage to the plaintiff must directly result from the one tort feasor against whom plaintiff has tendered the submission. The plaintiff in this case has, by leaving the direct result language in the verdict directing instruction, assumed an unnecessary burden. How this could be prejudicial to the defendant is not apparent.

Somewhat elliptically, the defendant in a different paragraph says that a finding required by the instruction, the "tipping" of the boom was the "direct result" of defendant's negligence and a finding that such negligence directly caused or combined with acts of Haggard confused and misled the jury. No further argument or authority is contained in the point, and it is sufficient to say again that the plaintiff's instruction placed a heavier than necessary burden on plaintiff and prejudice to defendant is not perceivable.

Defendant also asserts among the melange of claimed error unassisted by any analysis or citation of authority that plaintiff's submission that the tipping of the boom directly resulted from Sharp's negligence and that such negligence either directly or combined with the negligence of Haggard to cause the mishap are inconsistent. Plaintiff's instruction, however inartfully drawn, was attempting to utilize the option under MAI 19.01 in permitting the jury to find for plaintiff against one tort feasor when on the evidence more than one tort feasor may have been involved. Additionally, this claim of error, internal inconsistency, was not raised in the motion for new trial.

■ In a separate point, the defendant complains of the instruction defining negligence offered by the plaintiff, contending that it improperly and prejudicially deviates from MAI 11.02I because it was not added to the principal verdict directing instruction as required by the Notes on Use following MAI 11.02 and because the plaintiff, for some reason not apparent, added the word "negligent" to 11.02I so that the instruction defined the word "negligence" and the word "negligent." As the defendant properly stated, the word "negligent" appears nowhere else in the instructions, and it is also accurate as contended by the defendant that the definitional instruction was given separately and not as a part of the verdict directing instruction. For reasons not clear in the Notes on Use, the directions for use on 11.02 say that this definitional instruction "should" be appended to the principal

verdict directing instruction when the term is used only once, while the instructions for use on 11.04 and 11.05 use the permissive language "may" be added to the principal instruction. Assuming without deciding that 11.02 requires that the definition of negligence must be added to the principal verdict directing instruction when that is the only instruction utilizing the negligence concept and assuming further without deciding that the failure to do so in this case constituted error, then the issue still remains as to whether the failure to attach the definition of negligence to the verdict director constituted prejudicial error. In *Friend v. GEM International, Inc.*, 476 S.W.2d 134 (Mo.App.1971), the specific complaint was made that the definition of ordinary care was given in a separate instruction. In that case, as in this, the definitional instruction could only refer to the verdict directing instruction since the term under attack was not utilized in any other instruction. The court, considering the permissive language of MAI 11.05, held that there was not error but found that no possibility existed that the method of instruction used by the plaintiff could have confused or misled the jury. The reasoning of that case in considering the question of prejudice by reason of the use of a separate instruction seems persuasive here, for the jury could only have utilized the definitional instruction with respect to the one instruction, the verdict director, and, therefore, could not have been confused or misled by applying it to some other instruction using the term negligent or negligence.

On the issue of the addition of the word "negligent," an earlier decision of this court is in point. In considering an attack upon MAI 11.02I, the court held that where words had been added to the definition and those words did not change the meaning of the instruction, there was no prejudicial deviation or reversible error. *Newsom v. Crockett*, 453 S.W.2d 674 (Mo.App.1970). Webster's Third New International Dictionary (1966) defines negligence as the quality or state of being negligent. Negligence is a noun, and negligent is an adjective, but both have the same meaning and could not have confused or misled the jury.

Dealing with the claims of error made by the defendant as to the plaintiff's instructions has been rendered unnecessarily complex by the meaningless division of the points into subdivisions which so fragment the brief as to make it almost unintelligible. In some cases, the subdivision of the point is longer than the argument portion of the brief.

Such briefing requires this court to analyze and redefine the issues in some intelligible manner, an inappropriate task, since it casts the court in an advocate's role. Defendant's attack on the dual purpose doctrine instruction (MAI 13.03) typifies this problem. There are six separate and overlapping subpoints which raise only two real issues. First, does the dual purpose doctrine apply and, if so, does the instruction require the necessary finding of joint control as to the specific work in question?

On the first issue, there is no doubt that joint control was evidenced under this record. The oiler and operator, following the custom of the business, were furnished along with the crane. The evidence was explicit that although they followed Haggard's directions as to the work, they continued to be subject to the control of Sharp Enterprises and recognized the continuing duty to Sharp to protect the equipment.

Defendant's challenge to the instruction is that the instruction permits a finding that Sharp Enterprises' business created a necessity for the "work," which was without evidentiary support, and that the instruction, MAI 13.03, was improperly modified.

Defendant's argument, as it is understood, is that the dual purpose doctrine embraced within MAI 13.03 is limited to the situation where an employee acts for his own personal motives and in furtherance of his employer's business. The defendant would thus exclude the dual purpose doctrine from application to the borrowed servant situation present on these facts.

Neither party in their briefs has reached the essential issue involved in this

instruction and that is whether or not it properly submits under the borrowed servant doctrine against the lending employer Sharp Enterprises. It is true that MAI does not offer an instruction dealing with the issue of borrowed servants and the liability of the lending employer and the borrowing employer for their acts. Plaintiff here submitted on the theory of a borrowed servant by utilizing a modification of MAI 13.03 which is intended to cover the situation where an employee is about his original master's business and is, incidentally, either performing some personal errand or acting for an independent third person in part. Clearly, that theory is not intended to apply to the borrowed servant situation where liability is sought against the original employer or the lending employer. It is clear, however, under the law in Missouri, that such liability does, in fact, exist. The parties might have been well served in this case to have consulted *Parlow v. Dan Hamm Drayage Co.*, 391 S.W.2d 315 (Mo. 1965), a case remarkably similar on its facts to the instant case. In that case, the contractor erecting a grain bin employed a crane and its operator and oiler for the purpose of lifting certain parts of the bin into place so that the employees of the contractor could affix them to the structure. While this work was in progress, an employee of the contractor charged with the erection of the tank went upon the piece that was being held in position by the crane and it fell causing his death. The suit was brought under a res ipsa theory against the employer of the crane operator and oiler. The court in that opinion discusses clearly and succinctly the theory of liability imposed under the borrowed servant rule and holds that the question of whether under the circumstances of that work the crane operator was an employee of the contractor or of his general employer or both was a question of fact to be determined by the jury. Referring to Section 227, Restatement of Agency 2d, the court held, "[W]hether or not a person 'rented' becomes a servant of the one whose immediate purposes he serves depends in general upon the same factors which determine that one acting for another is a servant rather than an independent contractor." 391 S.W.2d at 320. Referring specifically to Section 227, comment c at page 501, "'A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value.'" 391 S.W.2d at 320.

■ Comparing the theory shown in the *Parlow* case, which is the appropriate theory for imposing liability in the instant case upon Sharp Enterprises, with the theory of 13.03, it will be seen that paragraphs 1 and 3 deal with the duality of the servant's activities and the right of control, the specific findings that must be made in order to impose liability upon the lending employer under the theory of the *Parlow* case. There is no requirement under the *Parlow* case that the master's business created the necessity for the work (trip). That requirement is included in MAI 13.03 because unless some necessity for the activity is connected with the master's business, there is no reason whatever for the application of the dual purpose doctrine. Thus, again, the plaintiff in its ineptly drawn and erroneous modification of 13.03, has an element of proof not required in order to affix liability upon Sharp Enterprises. The improper modification, as stated, is erroneous under the theory which must be applied to these facts, but its prejudicial effect is to be judicially determined. Again, as in the other instances of instructional inadequacy referred to earlier, the plaintiff has undertaken an unnecessary burden which required further proof than he was obligated to assume under the law applicable to this case. It is difficult to see how the defendant could be prejudiced by the plaintiff assuming the proof of a fact which he was not required to prove and which did not confuse or mislead the jury. Here, the unnecessary fact was the submission by the plaintiff in the second paragraph of his instruction that "Sharp Enterprises, Inc.,'s business created the necessity for such work."

Defendant says that changing the word "trip" in 13.03 to "work" and coupling it with "such" as well as changing the article, "the" to "a" permitted the jury to engage in guesswork, conjecture, surmise and speculation and reduced the burden upon the plaintiff by permitting the finding of a necessity rather than the necessity. If the plaintiff were required to show the necessity of such work, and there was an issue in this case as to whether the crane and its operator and oiler were engaged in some activities other than those clearly and directly related to the task at hand, there might be merit in the defendant's claim here. The jury could not have believed that "such work" referred to anything other than the hoisting of the sound cage to its destined position, nor could it have assumed or found any necessity for the work other than the joint purpose of Haggard to complete his contract and Sharp Enterprises to fulfill its obligation to Haggard by furnishing the crane operator and oiler for the performance of that work. The instruction does not prejudice the defendant and, consistent with this court's obligation, we do not find it to be prejudicially erroneous.

Sharp Enterprises also appeals from the dismissal of its indemnity claim against John Haggard. At the close of Sharp's evidence, the court sustained the motion of third party defendant Haggard for a directed verdict or in the alternative to dismiss the third party petition as follows:

"The Court has duly considered the arguments of counsel in chambers and the cases cited by both parties, and sustains the motion of Haggard to dismiss the third party plaintiff's petition with prejudice upon those grounds of third party defendant's motion numbered 2, that the evidence is insufficient as a matter of law to establish any passive negligence on third party plaintiff Sharp's part; 6, that all the evidence is insufficient as a matter of law to establish that third party plaintiff Sharp's liability to plaintiff arises solely by imputation of law because of

third party plaintiff Sharp's relation to third party defendant Haggard and 7,— no, I won't pass on that, just those two grounds. And the third party defendant Haggard is dismissed as a party in this case."

Sharp Enterprises first argues that the trial court erred in dismissing its third party petition against Haggard for indemnity because Sharp's employees, the crane operator and crane oiler, if they were negligent at all, were only passively negligent as compared to Haggard's active negligence.

"It is the general rule, where one person has been exposed to liability and compelled to pay damages on account of the negligence of another, the first has a right of action against the other for indemnity where the parties are not *in pari delicto*. In cases where one party creates the condition which causes the injury and the other does not join therein but is exposed to liability on account of it, the rule that one of two joint tort-feasors cannot maintain an action against the other for indemnity does not apply." *Barb v. Farmers Ins. Exchange*, 281 S.W.2d 297, 304 (Mo.1955). "It has often been said that the negligence of the party responsible for the dangerous condition is active and primary while the negligence of the other is passive and secondary." [3] *Kansas City Southern Railway Co. v. Payway Feed Mills, Inc.*, 338 S.W.2d 1, 5–6 (Mo.1960). The difference between active and passive negligence was discussed in *Crouch v. Tourtelot*, 350 S.W.2d 799, 805 (Mo. banc 1961), as follows (quoting):

" 'Without multiplying instances, it is clear that the right of a person vicariously or secondarily liable for a tort to recover from one primarily liable has been universally recognized. But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a

**3.** See *State ex rel. Siegel v. McLaughlin*, 315 S.W.2d 499, 502 (Mo.App.1958) for a list of situations in which Missouri courts have found secondary liability.

failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible. In the case of *concurrent* or *joint* tort-feasors, having no legal relation to one another, each of them owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other.' "

Sharp Enterprises contends that the negligence of its employees consisted only of a failure to ascertain the true weight of the sound cage, which is merely "a failure to discover or correct a defect or remedy a dangerous condition caused by the act of one primarily responsible." This basis for indemnity has been found in several cases.

In *Barb v. Farmer's Insurance Exchange, supra,* boxes stacked by agents of a tenant in a common passageway of a building fell upon a passerby. In a suit against both the lessor and the lessee, the court held that the lessor had a cross claim for indemnity against the lessee on the basis of the rule set out in the Restatement of Restitution, § 95, which provides:

"Where a person has became [sic] liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition." Restatement of Restitution § 95 (1937).

The lessor had protested the placing of boxes in the hallway, and they were placed there without the consent or acquiescence of the lessor.

In *Donald v. Home Service Oil Co.,* 513 S.W.2d 426 (Mo. banc 1974), plaintiff brought suit for property damage against Home Service Oil Co. (Home Service) and C.E.S. Truck Lines, Inc. (C.E.S.). Plaintiff's property had been damaged as a result of an explosion which occurred when a gasoline truck owned and operated by Home Service was delivering gasoline to gasoline tanks owned and operated on the premises of C.E.S. adjacent to plaintiff's property. Comparing the facts of this case to those in *Barb v. Farmers Insurance Exchange, Inc., supra,* the court held that C.E.S. would be entitled to a cross claim for indemnity if it could prove the alleged negligence of Home Service and that those acts were done "without the knowledge, acquiescence [sic] or consent of C.E.S. . . . even though plaintiff had theretofore recovered against both defendants under res ipsa."

In *McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co.,* 323 S.W.2d 788 (Mo.1959), Hartman, plaintiff's employer, contracted with McDonnell to paint its plant. Plaintiff was injured when he came into contact with an exposed electrical wire while painting and recovered a workmen's compensation award from Hartman. Plaintiff then sued McDonnell who brought a third party claim for indemnity against Hartman. The third party petition was dismissed for failure to state a claim and the supreme court reversed again relying on § 95 of the Restatement of Restitution. McDonnell alleged that Hartman knew of the dangerous condition of the premises, had agreed to warn its employees thereof and failed to so warn plaintiff. The court held, "We think these allegations show . . . that McDonnell had entrusted to Hartman the performance of its nondelegable duty to protect Hartman's employees from the exposed crane conduits but also that Hartman had agreed to assume and perform this duty and negligently failed to do so. We, therefore, hold that McDonnell's allegations show that, as between the two, it was Hartman's duty to protect [plaintiff] from this danger . . . .." 323 S.W.2d at 794.

In *Kansas City Southern Railway Co. v. Payway Feed Mills, Inc., supra,* plaintiff's employee was injured when his legs were caught between a boxcar he was riding and defendant's moveable dock which had been placed too close to the railroad tracks. In plaintiff's suit against defendants for indemnity, the court held that the evidence presented revealed a classic example of the type of case described by § 95 of the Restatement of Restitution in that a jury could find that (1) defendant created the dangerous condition in permitting its moveable dock to be located too close to the tracks in spite of plaintiff's warning of a safe minimum clearance (active negligence), and (2) plaintiffs were liable to their employee for their negligence in failing to discover the dangerous condition (passive negligence).

These cases are to be distinguished from the instant case in that the parties seeking indemnity therein were liable to the persons injured on the basis of nonfeasance as compared to the malfeasance of those against whom indemnity was sought. Thus, in *Barb v. Farmers Insurance Exchange* and *Donald v. Home Service Oil Co.,* co-defendants were held liable to the plaintiff on a res ipsa theory of joint control but the negligence of the parties seeking indemnity was based only on their right to control, as opposed to actual control of the property or chattels which were in a dangerous condition. Similarly, in *Kansas City Southern Railway Co. v. Payway Feed Mills, Inc.,* the party seeking indemnity was negligent in failing to discover the existence of dangerous conditions about which they had warned the party primarily liable and which were actually created by the latter.

Finally, in *McDonnell Aircraft Corporation v. Hartman-Hanks-Walsh Painting Co.,* the parties agreed that the one against whom indemnity was sought would assume the duty of the party seeking indemnity to warn third persons of a dangerous condition and that duty was not performed. Compare these cases to the following cases in which indemnity was not allowed.

In *Crouch v. Tourtelot, supra,* plaintiff was injured when the car in which she was a passenger was struck by defendant's automobile. The automobile in which plaintiff had been traveling was being driven by her husband who had stopped it on the pavement and alighted when the collision occurred. Defendant filed a third party petition against plaintiff's husband alleging active negligence on his part and only passive negligence on defendant's part. The supreme court affirmed the trial court's dismissal of the third party petition for failure to state a claim. The court noted that cases allowing claims for indemnity in favor of parties whose duty is only secondary as compared with that of the primary tortfeasor "involve more than a mere comparison of differing degrees of negligence by nonrelated parties," 350 S.W.2d 806. Here the defendant had been charged by plaintiff with specific acts of negligence, "all of which involve independent action on his part." While he had also been charged with a failure to discover the parked car in time, he had also been charged with affirmative negligence in running into it, excessive speed, failure to stop, slacken or swerve, and in failing to have his car under control. This the court held, could not be "passive" negligence.

The court in *Crouch* quoted extensively from the case of *State ex rel. Siegel v. McLaughlin,* 315 S.W.2d 499 (Mo.App.1958), which involved a collision between an automobile and a streetcar. Plaintiff was a passenger on the streetcar and brought suit against the St. Louis Public Service Co., the driver of the streetcar and the driver of the auto. The plaintiff had pleaded specific negligence against the driver of the automobile and res ipsa against the public service company and its driver. The court held that there could be no indemnity against the driver of the auto because the negligence charged against the defendants was of the same character, active and concurrent. "The fact that defendant streetcar company is charged under the res ipsa loquitur doctrine does does not render it less culpable. Before defendant streetcar company can be held liable it must be found negligent, and in this case the permissible

inferences under that doctrine would be of no different character than that charged against defendant Siegel. Such negligence would be active and concurrent, and a primary cause of plaintiff's injuries." 315 S.W.2d at 506–507.

The instant case, like *Crouch* and *McLaughlin*, involved independent acts attributable to the party seeking indemnity which were active, of the same character, and concurrent with those of the party against whom indemnity is sought. And, as observed by the court in *Crouch*, the disparateness of the duties owed by the one tortfeasor to the other is inapposite where they both owed substantially equal duties to the injured person. See *Crouch, supra*, 350 S.W.2d at 805. Nor does indemnity merely involve comparison of different degrees of negligence between joint tortfeasors.

The trial court correctly ruled that the evidence was insufficient as a matter of law to establish that Sharp Enterprises was only passively negligent, and this is true even under a res ipsa submission. Numerous witnesses testified that the weight of the sound cage being lifted could not be estimated by sight alone and the crane operator testified that Haggard gave him an incorrect weight although he had access to the exact weight of the lift. However, Sharp's own evidence also showed without contradiction that the crane operator determines the safety of the lift by applying the weight of the load and radius of the lift to a crane chart prepared by the manufacturer, that its employee operated the crane which was involved in the accident resulting in the death of plaintiff's decedent, and that although the crane operator did not see plaintiff's decedent get on the sound cage he did see two men climb onto the load outside of the stadium but did not conduct a dry run lift before the actual lift. It was undisputed that the oiler and the operator owed a duty to Sharp to avoid any damage to the crane itself and to check with Sharp if a lessee ordered them to do something which they felt might damage the crane.

■ Clearly, Sharp's uncontroverted evidence reveals that its employee was, if anything, guilty of misfeasance of the nature found in *Crouch* and *McLaughlin* rather than nonfeasance. Sharp's employee was at the controls of the instrumentality which caused the death of plaintiff's decedent and admittedly knew that some men might be on the load. Thus, he owed the same duty of care to plaintiff's decedent as did Haggard. Nor could the jury have reasonably based Sharp's liability solely on its failure to discover a dangerous condition created by another since the conduct of Sharp's employee in conducting the lift joined with that of Haggard in creating the hazard. Since Sharp's employee directly participated in the act which resulted in the death of plaintiff's decedent, both Sharp and Haggard are *in pari delicto.*

Defendant also attempts to base its right to indemnity upon the relationship between Sharp Enterprises and Haggard. Defendant's argument is that in renting the crane and directing Sharp's servants, Haggard assumed a duty not to subject Sharp to liability on account of acts directed by him and Haggard's failure to provide the correct weight to the crane operator constituted a breach of that duty. This argument is made in response to Haggard's defense that Sharp's indemnity claim is barred by the exclusive remedy provision of Missouri's Workman's Compensation Act, providing that the payment of benefits by an employer to an employee releases the employer "from all other liability therefor whatsoever, whether to the employee or any other person." Section 287.120 RSMo 1969.

■ Haggard distinguishes the cases of *McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., supra*; and *State ex rel. Laclede Gas Co. v. Godfrey*, 468 S.W.2d 693 (Mo.App.1971), where it was held that Section 287.120 did not bar an indemnity claim by a third person against an employer. In *McDonnell*, the supreme court held that Section 287.120 does not mean that the employer shall be released of liability to third persons "for breach of an independent duty or obligation owed to a third party by an employer whose liability for injury to his employee is under the

compensation act." 323 S.W.2d at 796. The court went on to hold that the third party petition stated a cause of action because the third party's right of indemnification from the employer was not based upon the employer's negligence towards its employee but rather upon "the breach of an independent duty to a third party which he [the employer] agreed to perform." 323 S.W.2d at 796. In *Laclede, supra,* an employee of Ace was injured in a natural gas fire and explosion in building occupied by Ace. In a suit by the employee against Laclede Gas Co., Laclede attempted to implead Ace on a theory of its active negligence and also upon the theory that Ace had agreed to maintain its facilities in a safe condition as a condition to receiving gas service from Laclede. The court held that the third party petition stated a cause of action and, following *McDonnell,* that Section 287.120 RSMo 1969 would not bar indemnity.

These cases involve express agreements between the parties whereby one agrees to make conditions safe for third persons, thus assuming that duty for the other party, the indemnity claims arising out of a breach of that agreement. Thus, the duty breached is a duty owed not only to the injured person, but to the third party plaintiff as well.

Sharp's claim is based upon an implied agreement that Haggard would not expose Sharp to liability, the agreement being implied from Haggard's rental and use of the crane. Aside from the fact that Haggard had no direct dealings with Sharp, having obtained the crane from his general contractor S–K–W, it is difficult to ascertain how Haggard's duty of care rises from the level of a lessee's general duty of ordinary care to an agreement between the parties that one would assume the duty of the other to make conditions safe for third persons. The facts simply do not support the finding of such an agreement, express or otherwise. Indeed, as noted above, it was Sharp's own evidence that it is the custom of the industry for the crane operator provided by the lessor to ascertain the range of safety for a lift. The trial court correctly found that the evidence failed to establish

Sharp's right to indemnity based upon a relationship between Sharp and Haggard. The issue of such a contractual relationship was raised by Sharp to counter Haggard's claim that the exclusive remedy provision of the Workmen's Compensation Act, § 287.120 RSMo 1969, barred indemnity against Haggard. The application of that statute would only be in issue if Sharp had been passively negligent and the issue need not be reached or decided here.

Judgment affirmed.

All concur.